THE COLONY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 53681. Filed April 9, 1956.

*Andrew W. Duncan, Esq.*, and *Don S. Sturgill, Esq.*, for the petitioner.

*James F. Shea, Esq.*, for the respondent.

32

36

38

OPINION.

HARRON, *Judge:*

## Issue 1.

The first question to be decided is whether the payments made by petitioner to five of its stockholders in the amounts of $8,988.41, $3,468, and $3,468, in the taxable years ended October 31, 1948, 1949, and 1950, respectively, were payments of interest on indebtedness, which are deductible under section 23 (b) of the 1939 Code, or whether the payments constituted nondeductible distributions in the nature of dividends. The determination of this issue depends on whether the $57,800 paid by the shareholders to petitioner in return for petitioner's notes constituted, in substance, a loan giving rise to a creditor-debtor relationship, or a contribution to capital, which gave the stockholders an additional proprietary interest.

The petitioner concedes that it is a "thin corporation." It argues, however, that the notes must be recognized as a valid indebtedness because the petitioner's capitalization reflected the business judgment of unrelated persons who dealt with each other at arm's length; be-

cause the notes were issued to the stockholders in face amounts which were disproportionate to their stockholdings; and because the transaction was carried out in the form proper to create an indebtedness, rather than a contribution to capital. The respondent takes the position that the $57,800 paid in by the shareholders must be considered as a contribution on their part to petitioner's capital, in view of the capital structure of the petitioner, the circumstances under which the notes were issued, and the lack of evidence indicating that the transaction was intended to create a debtor-creditor relationship.

The question to be decided is one of fact. *Sam Schnitzer*, 13 T. C. 43, 60, affd. 183 F. 2d 70, certiorari denied 340 U. S. 911. The issue is whether there was an intention to create a debtor-creditor relationship, on the one hand, or a capital contribution, on the other hand, "and such intention is a fact to be gleaned from the entire record." *Estate of Herbert B. Miller*, 24 T. C. 923. It is true, in this case, that the notes received by the five shareholders upon their payment of $57,800 to petitioner satisfy the formal requirements for a corporate indebtedness. However, our inquiry is not limited to the formalities, however meticulously observed, in which the parties cast their transaction. *R. M. Gunn*, 25 T. C. 424; *Estate of Herbert B. Miller, supra; Gooding Amusement Co.*, 23 T. C. 408, 418; *Proctor Shop, Inc.*, 30 B. T. A. 721, affd. 82 F. 2d 792. There are other factors present which establish that the $57,800 was paid over to petitioner by the stockholders to be placed immediately at the risk of petitioner's business as a capital contribution rather than as a true loan.

In the first place, the petitioner's formal capital, $1,000 was patently inadequate to carry on the business for which it was formed. The petitioner was organized to purchase, subdivide, and sell a substantial tract of land. For this purpose, petitioner's formal capital of $1,000 was wholly insignificant. To finance the project, the additional amount of $57,800 was turned over to petitioner by the stockholders, and in addition the petitioner obtained loans of at least $149,403 from banks. The bank loans were secured by liens on petitioner's real estate. The notes received by the stockholders were not secured. If petitioner's characterization of the transaction is accepted, it is apparent that petitioner's business was placed in operation with loans in the amount of $207,203, and formal capital in the amount of $1,000. This alleged arrangement, which amounts to an indebtedness to capital ratio of greater than 207 to 1, clearly establishes that petitioner was undercapitalized and strongly suggests that the shareholders recognized that the $57,800 would be risked in petitioner's business as a capital contribution to the same extent as the formal capital of $1,000. See *Hilbert L. Bair*, 16 T. C. 90, affd. 199 F. 2d 589. In these circumstances, we think our language in *Isidor Dobkin*, 15 T. C. 31, 33, affd. 192 F. 2d 392, is particularly appropriate:

When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business. *Cohen* v. *Commissioner*, 148 F. 2d 336; *Joseph B. Thomas*, 2 T. C. 193. The formal characterization as loans on the part of the controlling stockholders may be a relevant factor but it should not be permitted to obscure the true substance of the transaction. *Sam Schnitzer*, 13 T. C. 43, 60.

The conclusion that the parties did not regard the payment of the $57,800 to petitioner as a loan is also supported by their conduct subsequent to the issuance of the notes in April 1946. For example, the notes were not paid on the due date, namely, 5 years after issue, i. e., in April 1951. In fact, the evidence indicates that only one of the notes, that issued to L. B. Shouse, has been retired, and that the other notes were still outstanding at the time of the hearing of this proceeding. The stockholders other than Shouse held their notes as late as 1953, 2 years after the due date, and the evidence does not indicate that any attempt to enforce payment was ever made at any time after the due date. The parties treated their shares of stock and the notes as part of a single package whenever a transfer was made. For example, when petitioner acquired Shouse's note, it also acquired his stock. Similarly, in the transaction in 1953, in which Sturgill and Central Rock Company acquired, in equal shares, the outstanding stock of petitioner held by Meriwether, Blakely, Leet, and Nunn, the notes held by the latter four persons also were acquired.

On the basis of the foregoing, it is concluded that the petitioner has failed to establish that the notes issued to its shareholders in the face amount of $57,800 represented a valid indebtedness. It is held that the respondent properly disallowed the deductions claimed by petitioner for interest on indebtedness for the years ended October 31, 1948, 1949, and 1950, in the respective amounts of $8,988.41, $3,468, and $3,468.

In reaching our conclusion we have considered petitioner's contentions concerning the disproportionate holdings among the shareholders of stock and notes. Under the circumstances of this case, we attribute to this no greater weight than if petitioner had issued disproportionate amounts of common and preferred stock. Similarly, we consider of little weight petitioner's argument that the obligations represented by the notes were not subordinated to claims of other creditors. It is true that the notes, on their face, were not subordinate obligations. Under the facts of this case, however, little significance can be attached to this factor. For one thing, there was a lien on petitioner's principal asset, its real estate, in favor of the banks. This lien secured loans made by the banks to petitioner in the original amount of at least $149,403. In the second place, it appears that petitioner's liabilities

in each of the taxable years were in negligible amounts, compared to the $57,800 in question. For example, petitioner's liabilities at the end of the taxable years October 31, 1946, to October 31, 1950, ranged from a low of $986.04 on October 31, 1949, to a high of $5,325.74 on October 31, 1946, and averaged $2,470.29. On the entire record, it is concluded that the respondent must be sustained on this issue.

## Issue 2.

The narrow question to be decided under this issue is the proper amount which petitioner may add to its cost of Colony lots for the cost of development work in The Colony subdivision. It is well established that where subdivision lots are sold before development work is completed, the seller may include in his cost of the lots an allocation of his estimated future expenditures for improvements to the subdivision. *Country Club Estates, Inc.*, 22 T. C. 1283, 1293–1294; *Cambria Development Co.*, 34 B. T. A. 1155.

The petitioner included in its cost of Colony subdivision lots a total of $93,074.12 for development expenses, and added a pro rata portion of this total to its cost of The Colony lots which it sold in the taxable years ended October 31, 1946, 1947, and 1950. The respondent determined that the development expenses claimed by petitioner were excessive, and that the proper amount to be added to petitioner's cost of the lots did not exceed $44,988.55. The respondent accordingly reduced the cost or other basis which the petitioner claimed in the lots which were sold, and increased the profit reported by petitioner from the sale of these lots. The amount by which the respondent reduced the petitioner's cost or other basis in the lots in each of the years ended October 31, 1946, 1947, and 1950, equalled a pro rata part of $48,086.06, the total amount by which the respondent reduced the development costs claimed by petitioner. The petitioner does not contest the percentage method used by respondent to redetermine the cost of the lots, in the event it is determined that petitioner overstated its development costs. The petitioner does claim, however, that its development costs were not overstated in the amount determined by the respondent.

The amount of estimated development costs disallowed by respondent, $48,086.06, is the total of three items, namely, an expenditure of $33,781.70 to construct a water supply system; payments to utility companies in the amount of $8,713.54; and the sum of $5,590.82, which is the excess of the petitioner's estimated development costs of $93,074.61 over the total amount it claimed to have expended for development purposes as of September 30, 1950, namely, $87,483.79. The respondent, in effect, allowed as development costs the total amount petitioner claimed to have expended as of September 30, 1950,

other than the cost of the water supply system and the amounts paid to utility companies.

The respondent's position under this issue is that the expenditures incurred to acquire the water supply system and to make payments to the utility companies are not properly chargeable to development costs which can be added to the cost of the subdivision lots. In the case of the portion of the estimated costs which petitioner had not expended as of September 30, 1950, or $5,590.82, the respondent contends that no part of the $5,590.82 will be required for future improvements, and that petitioner's original estimate of $93,074.61 for future developments was excessive in the amount of $5,590.82. The three adjustments will be discussed separately.

Petitioner introduced no evidence at the hearing of this proceeding to establish that further development work was required at The Colony after September 30, 1950, or that any expenditures were in fact made after that date for purposes of development or improvement. We accordingly sustain respondent's determination that the petitioner's estimate for future development costs, $93,074.61, was excessive in the amount of $5,590.82, which is the portion of petitioner's estimate which had not been expended as of September 30, 1950. *Butler-Fornari Realty Corporation*, 37 B. T. A. 933.

The next item under this issue relates to the water supply system. The petitioner has abandoned its original contention that the entire cost of the water supply system is a development expense which can be allocated to its cost of the subdivision lots. It concedes now that the "distribution system" or piping which carried the water from the "pumping system" to the houses, is not a development expense. It now claims that only the cost of the pumping station or pumping system is a development cost which should be added to its cost of the lots. The petitioner contends that the lots were unsalable without a water supply system, and that it was required to construct such a system because the cost of connecting the subdivision with the facilities of the Lexington Water Company was prohibitive. The petitioner contends further that when the facilities of the Lexington Water Company eventually extend to the subdivision, the pumping station will be of no further use and will have no value other than for salvage. The petitioner contends that under these facts, the cost of the pumping system must be added to its cost of the lots. The petitioner relies on *Country Club Estates, Inc., supra.* In that case, the taxpayer was in the business of selling subdivision lots. In order to induce people to purchase lots, the taxpayer conveyed a portion of its tract to a nonprofit organization for the purpose of having a country club constructed. It was held that the cost of the property transferred by the taxpayer should be regarded as part of its basis in the subdivision lots which it sold.

The difficulty with petitioner's contention is that, unlike the taxpayer in *Country Club Estates, Inc., supra,* the petitioner has not given up any property in order to sell its lots. For the funds it expended, the petitioner acquired a water supply system which it owned and operated during the taxable years and thereafter. It is true that the system has not been operated at a profit, due, perhaps, to the small number of houses which have been constructed at The Colony. And it also may be true, as petitioner contends, that the pumping station may be abandoned at some time in the future, when the facilities of the Lexington Water Company reach the subdivision. These circumstances, however, do not alter the fact that the petitioner retained full ownership and control of the water supply system during the taxable years, and that it did not part with the property for the benefit of the subdivision lots. Because of this retention of ownership, *Country Club Estates, Inc., supra,* is distinguishable. The retention of ownership also distinguishes this proceeding from cases in which the subdivider is permitted to add to his cost of lots the cost of land which has been dedicated or donated for use as streets. See, *Commissioner* v. *Laguna Land & Water Co.,* 118 F. 2d 112, modifying, on other grounds, a Memorandum Opinion of the Board of Tax Appeals. We think the facts in this proceeding more closely resemble *Biscayne Bay Islands Co.,* 23 B. T. A. 731. In the latter case, the taxpayer subdivided for sale the waterfront portion of its property. The interior portion of its property was set aside, for a term of years only, and not irrevocably, for use as a public park. It was held that the taxpayer's cost of the waterfront lots did not include the cost of the interior park property because the taxpayer had not irrevocably parted with the interior property. We said (p. 735) :

This area was not permanently and irrevocably dedicated to the public, but may later be sold by petitioner. The possibility of gain has only been postponed. It is unlike the area used for public streets, which is permanently beyond the possibility of sale and gain, the cost of which must be absorbed in the salable lots. See *Oak Woods Cemetery Association,* 6 B. T. A. 1003.

It is held that the cost of the water supply system may not be added to the cost of The Colony subdivision lots for the purposes of computing petitioner's gain on the sale of such lots.

There is an additional dispute between the parties which relates to the cost of the water supply system. The respondent determined that the total cost of the system which the petitioner had added to its cost of the lots was $33,781.70. The petitioner claims that the cost of the system was $33,277.61, or $504.09 less than the amount determined by respondent. The question is one of fact and the petitioner has the burden of proving the respondent's determination erroneous. The cost of the water supply system was not separately stated in the books of account maintained by petitioner. Petitioner relies, in support of

its contention, on an analysis of invoices made by the engineer who supervised the construction of the water supply system. However, the evidence indicates that the engineer did not have available all the invoices relating to the construction of the system. At one point the engineer testified that "practically all" the bills for materials and services came into his hands; elsewhere, he stated that the bills of which he had knowledge accounted for about 80 per cent of the cost of the project. In either event, the petitioner has not established that the engineer upon whose testimony it relies had knowledge of the total cost of the system. It is concluded that the petitioner has failed to establish that the cost of the water supply system was less than the amount determined by the respondent. It is held that the cost of the water supply system was $33,781.70, and that this amount is not includible in the cost of The Colony lots sold by petitioner.

The final question relating to the petitioner's cost of The Colony lots concerns the payments made by petitioner to the Gas Company and to the Utilities Company. The petitioner made payments to the companies in the total amount of $8,713.54, and included this amount in the cost of its Colony lots. The respondent takes the position that the petitioner is not entitled to add any part of the payments to the cost of the lots it sold during the taxable years, because there existed a possibility that all or a part of the payments might be refunded to petitioner at some time after the taxable years.

The evidence establishes that the companies required the payments to be made before they would extend their services to Colony. The payments were made to the companies in accordance with written agreements, the pertinent provisions of which are stated in the findings. Pursuant to the contract with the Gas Company, the petitioner paid $6,535 to the Gas Company in January 1948. The contract provided that the petitioner would receive a refund of $75 for each new customer connected to the company's gas mains, but that no refund would be made after 10 years from the date of the contract, i. e., after October 16, 1956. In the case of the second company, the Utilities Company, the petitioner made payments in the total amount of $2,178.54 in 1948 and 1949. The contracts with the Utilities Company provided that a refund of approximately $160 would be paid to petitioner for each new customer connected to the company's electric line, but that no refund would be made after 5 years from the time of completion of the service extensions provided in the contract. The period during which petitioner was entitled to receive refunds from the Utilities Company did not expire during the taxable years.

It is true, therefore, as respondent contends, that there was no way to ascertain, during the taxable years, the total amount of refunds which petitioner might receive under its contracts with the two companies. We do not think, however, that this circumstance militates

against the petitioner. The determinative factor is that the petitioner made unconditional payments to the two companies in order to obtain utility service for The Colony, and thereby to attract customers for The Colony lots. The payments were thus closely related to the sale of the lots, and petitioner's income from the sale of lots will be more clearly reflected if a pro rata portion of the payments in question are included in its basis for gain or loss in each lot which was sold. On the other hand, the receipt of refund payments from the utility companies is less closely related to the improvement of the lots for sale. The payment of a refund would be made only if a new customer was connected to the utility companies' service extensions, rather than at the time a lot was sold. Thus, if lots were sold to purchasers who, for some reason, did not proceed to construct residences, the petitioner would not receive refunds; or, if a purchaser acquired two or more lots, on which only one residence was constructed, the petitioner would receive only one refund, rather than a number of refund payments equal to the number of lots sold to the purchaser. Under these circumstances, it is concluded that the payments to the utility companies were directly related to the improvement of The Colony lots for sale, and that the petitioner correctly included these payments in computing its basis for gain or loss in the lots which it sold. The question of the taxability of the refunds which petitioner may receive from the utility companies is not before us. It is noted, however, that the petitioner concedes, on brief, that such refunds would, if made, constitute taxable income. See *Chevy Chase Land Co.*, 34 B. T. A. 150.

### Issue 3.

The final question to be decided is whether the deficiencies determined for the taxable years ending October 31, 1946, and October 31, 1947, are barred by the statute of limitations. The deficiency notices for these 2 years were mailed within the extended period provided in waivers which the petitioner originally executed more than 3 years and less than 5 years after the returns were filed. The question is whether the 5-year statute of limitations contained in section 275 (c) of the 1939 Code [1] is applicable in this proceeding. The petitioner omitted from gross income in each year an amount properly includible therein which was in excess of 25 per cent of the gross income reported. The petitioner contends, however, that section 275 (c) is inapplicable

---

[1] SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.
Except as provided in section 276—

* * * * * *

(c) OMISSION FROM GROSS INCOME.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.

because the omission resulted from an overstatement of cost of goods sold, rather than from an omission of gross receipts. The petitioner relies on *Uptegrove Lumber Co.* v. *Commissioner*, 204 F. 2d 570, reversing a Memorandum Opinion of this Court, and on *Deakman-Wells Co.* v. *Commissioner*, 213 F. 2d 894, reversing 20 T. C. 610. Our holding in *Estate of J. W. Gibbs, Sr.*, 21 T. C. 443, however, requires that this issue be decided in favor of the respondent. We have recently reviewed the decision in the *Gibbs* case in the light of the decisions in the *Uptegrove Lumber Co.* and *Deakman-Wells Co.* cases, and have decided to adhere to the rule in the *Gibbs* case. *John E. Goodenow*, 25 T. C. 1. On the basis of the *Gibbs* and *Goodenow* cases, it is held that the 5-year statute of limitations in section 275 (c) is applicable, and that the deficiencies determined for the years ending October 31, 1946, and October 31, 1947, are not barred by the statute of limitations.

*Decision will be entered under Rule 50.*