Lockwood Realty Corporation v. Commissioner.Lockwood Realty Corp. v. CommissionerDocket No. 63245.United States Tax CourtT.C. Memo 1958-49; 1958 Tax Ct. Memo LEXIS 179; 17 T.C.M. (CCH) 247; T.C.M. (RIA) 58049; March 31, 1958*179 Held: (1) Petitioner has failed to show that payments in issue constitute interest within the meaning of section 23(b), I.R.C. of 1939. (2) Reasonable compensation paid by petitioner to its officers for each of the taxable years, within the meaning of section 23(a)(1)(A), I.R.C. of 1939, determined. Charles H. Tobias, Jr., Esq., and Paul W. Steer, Esq., for the petitioner. Mark H. Berliant, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income tax of petitioner as follows: Fiscal Year EndedDeficiencyJune 30, 1953$1,714.41June 30, 19541,676.20June 30, 19551,678.25 There are two issues for decision: (1) whether respondent erroneously disallowed a deduction for interest*180 expense for each of the years in issue; (2) whether respondent erroneously disallowed part of a deduction for management fees for each of the years in issue. Findings of Fact The stipulated facts are included herein by this reference. Petitioner is a corporation organized and operating under the laws of the State of Ohio with its principal office in Cincinnati. The Federal income tax returns of petitioner for the period in issue were prepared according to a fiscal year ended June 30, and were filed with the director of internal revenue at Cincinnati, Ohio. In 1947 Isaac Rabkin saw an announcement that the Lockwood Court Apartments were to be sold at a sheriff's sale. Rabkin had been active in managing real estate for several years and decided he would like to purchase the apartments. Not wishing to obligate himself for the entire purchase price, he interested Herman B. Itkoff in making such purchase. Itkoff is an optometrist and knew very little about real estate. He had known Rabkin socially and knew that he had been active in the real estate business. He was induced to join Rabkin in a real estate venture because he believed Rabkin had been successful in the past as a manager*181 of real estate. On June 6, 1947, Isaac Rabkin, Herman B. Itkoff, and Itkoff's sister, Pearl Jurin, were the successful bidders at a sheriff's sale in case No. A-103330 of the Hamilton County, Ohio, Court of Common Pleas and purchased real estate known as the Lockwood Court Apartments located in Cincinnati, Ohio. This was a brick building containing 69 apartments, 4 stores, and a 36-car garage. The purchase price was $249,600, of which $10,000 was paid at the time of the sale. The terms of the sheriff's sale had required that $10,000 accompany each bid. On June 7, 1947, Rabkin and Itkoff visited the office of their attorneys, Steer, Strauss and Adair, and made the initial arrangements for the incorporation of petitioner. The articles of incorporation were signed on June 7, 1947, and were filed with the Secretary of State, State of Ohio, on June 9, 1947. On June 16, 1947, Rabkin and Itkoff, together with their respective spouses and Pearl Jurin, assigned, set over, and transferred all their right, title and interest in Lockwood Court Apartments to the petitioner. This assignment was filed in the Court of Common Pleas on June 23, 1947. On that date the Common Pleas Court ordered that*182 a deed be delivered to petitioner for the premises involved upon payment of the balance then due on the purchase price, to-wit, $239,600. On June 24, 1947, Rabkin subscribed for and received 10 shares of the stock of petitioner and Itkoff and Pearl Jurin each subscribed for and received 5 shares of such stock, all at a price of $500 per share. Itkoff, Rabkin and Paul W. Steer were elected directors of petitioner. Rabkin and Itkoff subsequently acted as president and treasurer, respectively. On that same date the petitioner executed a note and mortgage to the Columbus Mutual Life Insurance Company in the amount of $180,000 against said real estate. On that date Itkoff and Rabkin each advanced to petitioner $29,800. In exchange therefor petitioner executed two promissory notes (identical except for the names of Rabkin and Itkoff) as follows: "PROMISSORY NOTE Cincinnati, Ohio, June 24, 1947 "$29,800.00 "ON DEMAND after date, Lockwood Realty Corporation promises to pay to the order of Isaac Rabkin [Herman B. Itkoff], the sum of Twenty-nine Thousand Eight Hundred Dollars. "This note is for value received, payable at Cincinnati, Ohio, and is identical with one issued this*183 day to Herman B. Itkoff [Isaac Rabkin] by the maker hereof, both of which notes are referred to in a Memorandum of Agreement between Herman B. Itkoff and Isaac Rabkin dated June 24, 1947. "This note shall bear interest at the rate of five (5%) per cent per annum. "Lockwood Realty Corporation "By Isaac Rabkin, President and Secretary "Herman B. Itkoff Vice President and Treasurer" Rabkin and Itkoff also entered into a memorandum agreement which is as follows: "MEMORANDUM OF AGREEMENT "WHEREAS, Isaac Rabkin and Herman B. Itkoff joined together to purchase the property located at 2543 Woodburn Avenue known as the Lockwood Court Apartments; and "WHEREAS, to accomplish said purchase, Lockwood Realty Corporation was formed, the stock therein being apportioned 50% to the said Rabkin, 25% to the said Itkoff, and 25% to Mrs. Pearl Jurin, sister of the said Itkoff; and "WHEREAS, the parties have caused Lockwood Realty Corporation to borrow the sum of $180,000 from The Title Guarantee & Trust Company, Cincinnati, Ohio; and "WHEREAS, the purchase price of said property was $249,600; and "WHEREAS, it is the intention of the parties to evidence their joint agreement and*184 working arrangement and method of contribution in connection with Lockwood Realty Corporation: "NOW, THEREFORE, BE IT AGREED BY AND BETWEEN THE PARTIES as follows: "1. Rabkin and Itkoff will cause Lockwood Realty Corporation to issue to each of them a promissory note, each in the sum of $29,800, said notes bearing interest at the rate of 5% per annum. These said notes will be issued to cover cash money advanced by each Itkoff and Rabkin in the purchase of the property, and will constitute loans by them to the corporation. "2. By these presents the parties acknowledge that each has contributed to the capital of the corporation the sum of Five Thousand Dollars ($5,000), for which payment stock is to be issued as follows: Isaac Rabkin10 shs. at the subscriptionprice of $500 eachHerman B. Itkoff5 shs. at the subscriptionprice of $500 eachMrs. Pearl Jurin5 shs. at the subscriptionprice of $500 each "3. Neither party shall sell the aforementioned stock, or any stock in said corporation hereafter issued, without first extending to the other a 60-day privilege of purchase at the book value thereof. "In this respect Itkoff binds himself to cause*185 Mrs. Pearl Jurin to likewise restrict the sale of her said shares as provided herein. "4. Neither party will call the notes hereinabove referred to, in the amount of $29,800 each, except upon 60 days notice to the corporation and to the other party herein. "It is further agreed that if either party does call the note referred to herein, the stock shall be offered to the other at the book value, as provided in Paragraph 3, and Itkoff binds himself to cause Mrs. Pearl Jurin to do likewise. "IN WITNESS WHEREOF, the parties have hereunto set their hands this day of , 1947. "Isaac Rabkin "Herman B. Itkoff" The proceeds of the transactions referred to above, aggregating $239,600, were paid to the sheriff of Hamilton County in consideration for receiving a deed to the aforesaid real estate. The original books and records of petitioner show a loan indebtedness to Rabkin and Itkoff each in the amount of $29,800. The financial structure of petitioner according to such books consisted of $239,600 of debt and $10,000 invested capital. On its Ohio property tax return for 1948 petitioner reported the two notes payable to Rabkin and Itkoff as "notes payable." It also reported as "interest*186 paid" the five per cent return paid on such notes for the year 1947. On the Ohio returns of taxable property for the years 1949 to 1952, inclusive, during which time he was a resident of Ohio, Rabkin reported the note issued by petitioner as a note held. On July 29, 1947, petitioner reported to the Division of Securities for the State of Ohio that it had issued as stock 10 shares to Rabkin and 5 shares each to Itkoff and Jurin. It further reported that the exact selling price per share was $500. During each of the years in issue petitioner paid a dividend to its shareholders amounting to one dollar per share. Petitioner's dividends paid, earned surplus, payments on the $180,000 mortgage loan for each of the years in issue, and cash on hand at the end of each year are as follows: Divi-YeardendsEarnedMortgageCash onEndedPaidSurplusPaymentsHand6-30-53$20.00$41,931.25$17,899.12$ 209.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.0052,183.9112,500.973,095.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.0064,805.3113,010.215,942.75During each of the years in issue petitioner has paid a five per cent return on the face amount of each of the notes issued to Rabkin and Itkoff*187 which amounted to $2,960 for each year. On its Federal income tax returns for each of such years petitioner claimed a deduction for such amounts as interest expense. Respondent disallowed such deduction. Petitioner has made no payments on the principal amount of such notes. After petitioner acquired the apartments Itkoff collected the rentals, entered the amounts thereof in the petitioner's books, made deposits, received and paid all bills. When petitioner was organized Rabkin owned approximately eight other pieces of real estate and was managing other property. Rabkin supervised the general operation of the building owned by petitioner and the repairs thereto until he moved to Miami, Florida, in November 1953. Prior to that time Rabkin had received many complaints of tenants. Itkoff subsequently received and answered such complaints. During the period in issue Rabkin made the basic business decisions. On June 24, 1947, petitioner executed an agreement with The Title Guarantee and Trust Company (hereinafter referred to as Agent), which provided that in the event petitioner defaulted on its mortgage loan obligation to Columbus Mutual Life Insurance Company the Agent should assume*188 the management of the apartments owned by petitioner and receive as compensation an amount equal to six per cent of rents collected. At the time petitioner acquired the apartments the annual rental income therefrom was approximately $37,000. The gross rentals received by petitioner for each of the years in issue was as follows: Year EndedRental ReceivedJune 30, 1953$54,421.43June 30, 195456,544.70June 30, 195556,430.90 Petitioner paid Rabkin and Itkoff $2,000 each as compensation for services for the fiscal years ended in 1948 and 1949. On June 2, 1949, at a meeting of petitioner's board of directors a resolution was adopted which provided as follows: "RESOLVED that Isaac Rabkin and Herman B. Itkoff be paid respectively the sum of $5,000 each as a management fee for the fiscal year 1949-50, and for such other services as may be rendered to the corporation, and that the foregoing management fees be paid to each until further action on the matter." Petitioner paid as management fees the following amounts to Rabkin and Itkoff: Amount Paid toYear EndedRabkinItkoff6-30-50$2,000$2,0006-30-513,0003,0006-30-523,0003,0006-30-533,0003,0006-30-543,0003,0006-30-553,0003,000*189 On its Federal income tax returns for the years in issue petitioner deducted the payments for such years as management fees. Respondent disallowed such deductions to the extent that they exceeded six per cent of gross rental income for each respective year. After Rabkin moved to Florida in 1953, he returned to Cincinnati approximately ten times during the remainder of the period in issue. On such occasions he contacted Paul Steer and Itkoff concerning the business of petitioner. Reasonable compensation for the services of petitioner's officers, Rabkin and Itkoff, in the management of its business for each of the taxable years involved, is the aggregate amount of $4,000, or $2,000 to each. Opinion ISSUE I. The first issue for decision is whether the payments made by petitioner in the amount of $2,980 during each of the years in issue to Rabkin and Itkoff pursuant to the provisions of the notes are deductible as payments of interest within the meaning of section 23(b), Internal Revenue Code of 1939, 1 or whether they were distributions in the nature of a dividend. Petitioner is entitled to the interest deduction if, as it contends, the amounts advanced by Rabkin and Itkoff*190 in connection with the issuance of such notes constituted bona fide loans and not contributions in the nature of capital investments. Although the cases are legion involving this question, they have carefully avoided establishing a rule of thumb for reaching a decision. Each determination depends upon the particular facts involved and the burden is upon the taxpayer to show that the payments in question were in fact interest and not dividends. Gooding Amusement Co. v. Commissioner, 236 Fed. (2d) 159, affirming 23 T.C. 408, certiorari denied 352 U.S. 1031; Wetterau Grocer Co. v. Commissioner, 179 Fed. (2d) 158, affirming a Memorandum Opinion of this Court [8 TCM 434,]. *191 It is true in the instant case that the notes received by Rabkin and Itkoff amounting to $59,600 satisfied the formal requirements for a corporate indebtedness and that they were reflected as such on the corporate books and records as well as documents and returns filed by the parties with the State of Ohio. However, our inquiry is not limited to the formalities, however meticulously observed, in which the parties cast their transactions. The Colony, Inc., 26 T.C. 30, affd. 244 Fed. (2d) 75, certiorari granted on other grounds, U.S. ; 1432 Broadway Corporation, 4 T.C. 1158, affd. 160 Fed. (2d) 885. Other factors establish that the $59,600 was placed at the risk of petitioner's business rather than as a true loan. The $10,000 initially advanced by Rabkin and Itkoff was admittedly inadequate to commence the corporate venture since the purchase of its asset, the apartment building, required a total of $249,600. To raise the needed amount petitioner negotiated a bank loan of $180,000 and the remaining $59,600 was advanced equally by*192 Rabkin and Itkoff who both stated that without such advances the corporation could not have commenced operations. "When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business." Isidor Dobkin, 15 T.C. 31, 33, affd. per curiam 192 Fed. (2d) 392. It is also to be noted that the corporation's financial structure as characterized by petitioner consisted of $239,600 debt and $10,000 invested capital or a debt-equity ratio of approximately 24 to 1. The "thin capitalization" of a corporation has been considered indicative that the relationship between the corporation and noteholders was proprietary rather than debtor-creditor. R. M. Gunn, 25 T.C. 424, affd. 244 Fed. (2d) 408, certiorari denied 355 U.S. 830;*193 The Colony, Inc., supra; Pocatello Coca-Cola Bottling Co. v. United States, 139 Fed. Supp. 912. The facts also show that the notes involved could not be called unless the stock held by the parties was offered for sale at the same time. In this connection it is to be noted that Itkoff was bound to cause Pearl Jurin to offer her stock if he desired to call his note. By this agreement the parties in effect placed the notes and stock of the corporation in one package. This is also an indication that the entire amount of the advances was a capital contribution. Cf. The Colony, Inc., supra.The fact that the notes were payable on demand is of no practical significance. It has been established that the entire amount advanced to the corporation through stock subscription, mortgage loans and the subject notes went into the purchase price of the apartment building. Thus in the early years of the petitioner's existence it is apparent that a calling of the notes would only have resulted in jeopardizing or rendering petitioner insolvent since it was not in financial condition to redeem them. Even at the end of the period in issue petitioner's cash position*194 was such that the notes could not be redeemed. It is clear, therefore, that payment of the notes involved was dependent on the earnings of petitioner. Certainly Itkoff and Rabkin would not call the notes or demand interest when the corporation did not have funds for payment. Such a course would not be in conformity with reason or sane business practice since it would be injurious and detrimental to themselves as holders of the stock. Cf. Mullin Building Corporation, 9 T.C. 350, affd. per curiam 167 Fed. (2d) 1001. From Rabkin's testimony it appears that petitioner reduced the outstanding mortgage as rapidly as possible without any regard for payment of the notes. No amount had been paid on the principal of the notes to the time of the hearing, ten years after the incorporation of petitioner. The realities of the situation indicate that the entire amount advanced by Rabkin and Itkoff was placed at the risk of the business. Considering all of the facts and circumstances, it is concluded that petitioner has failed to establish that the notes issued to Rabkin and Itkoff in the face amount of $59,600 represented bona fide indebtedness and not capital contributions. *195 Accordingly, on this issue we sustain respondent. In presenting its argument petitioner has primarily relied upon Wilshire & Western Sandwiches, Inc., v. Commissioner, 175 Fed. (2d) 718; Rowan v. United States, 219 Fed. (2d) 51; Earle v. W. J. Jones & Son, Inc., 200 Fed. (2d) 846; Kraft Foods Co. v. Commissioner, 232 Fed. (2d) 118. We find nothing in those cases inconsistent with the principles we have applied herein. See Gooding Amusement Co. v. Commissioner, supra.Petitioner urges that the advances in issue were not proportional to the stockholdings of the petitioner and that this is evidence such advances were loans rather than equity. Although the stock was issued 10 shares to Rabkin and 5 each to Itkoff and Pearl Jurin, other facts of record raise serious doubts as to whether the beneficial ownership of petitioner was as evidenced by such stock. The testimony of Itkoff that he contributed $5,000 of the $10,000 down payment for which the stock was issued, the statements of Rabkin that he and Itkoff were in the business jointly and the memorandum of agreement between Rabkin and Itkoff all support respondent's*196 contention that the ownership of petitioner was on a 50-50 basis and that Pearl Jurin was merely a nominal shareholder. It is readily apparent that if not beneficially owned equally by Rabkin and Itkoff the stock of petitioner was equally controlled by them. In view of this we attach no significance to the fact that the advances were not proportional to the stock ownership of record. Cf. The Colony, Inc., supra.Nor do we find persuasive petitioner's argument that Rabkin and Itkoff wanted to loan the money to petitioner to insure a fixed rate of return in the event they could not agree on dividend declarations. Cf. Mullin Building Corporation, supra.ISSUE II. The next issue is whether the amounts paid to Rabkin and Itkoff during each of the years in issue and deducted as "management fees" on the petitioner's income tax returns for the respective years were reasonable within the meaning of section 23(a)(1)(A) of the Internal Revenue Code of 1939.2 Although designated as "management fees" the problem involves the reasonableness of salaries or compensation. *197 The burden of proving reasonableness of compensation is upon the taxpayer. Botany Worsted Mills v. United States, 278 U.S. 282. The question of what constitutes reasonable compensation is essentially a question of fact to be determined by the peculiar facts and circumstances of each particular case. Miller Manufacturing Co. v. Commissioner, 149 Fed. (2d) 421. It has also been held that special scrutiny should be given to compensation paid officers of a corporation wherein the stock is closely held because of the lack of arms-length bargaining which in turn may indicate an intent to affect and disguise a distribution of profits. Golden Construction Co. v. Commissioner, 228 Fed. (2d) 637, and Heil Beauty Supplies, Inc. v. Commissioner, 199 Fed. (2d) 193, both affirming Memorandum Opinions of this Court [13 TCM 1124, T.C. Memo. 1954-221 and 9 TCM 1125]. *198 In the instant case petitioner deducted $6,000 during each of the years in issue as a management fee. The amount deducted as management fees for each of the years in issue was approximately eleven per cent of gross rentals. Respondent disallowed such deductions to the extent they exceeded six per cent of gross rentals. The amount determined by respondent as reasonable compensation to petitioner's officers is apparently based upon the agreement between petitioner and The Title Guaranty and Trust Company wherein, in the event of default in mortgage payments, it was agreed that the Title Company should manage the property as agent for petitioner and the mortgagee in consideration of six per cent of the rents collected. In this connection, there is also testimony that the fee established by the Cincinnati Real Estate Board for managing property such as that owned by petitioner was five per cent of the rents collected. It is petitioner's position, however, that the amounts paid and deducted by it as management fees were reasonable inasmuch as the services of the officers were in excess of those performed under the ordinary management contract and also included compensation to Rabkin*199 and Itkoff as officers. Petitioner relies upon the testimony of Rabkin and Itkoff. Rabkin testified that prior to his moving to Florida in November of 1953 he supervised construction and repair work on the apartments and also did some of the manual labor himself, as well as receiving and responding to complaints of tenants and performing the services of a resident manager. He testified that the compensation for such services under the fee schedule of the Real Estate Board would have amounted to twelve per cent of gross rentals. Assuming, however, that the character of such services is not such as is contemplated by the ordinary management contract, petitioner has offered no proof of the extent of such services or the amount of time required to perform them. Rabkin's testimony as to the extent, as well as amount of time spent thereon, was vague and indefinite. He testified he was "on the job" from seven in the morning until ten at night. He admitted, however, that he owned eight other properties and was also managing others. Itkoff was a practicing optometrist with little knowledge or experience in managing real estate. As treasurer, he collected the rentals, entered the amounts on*200 petitioner's books, and received and paid bills. After Rabkin moved to Florida, he also received and answered complaints of tenants. After he moved to Florida. Rabkin returned to Cincinnati approximately ten times during the period involved. On these occasions he conferred with Itkoff and Steer concerning the business of petitioner. It is not shown whether he attended to other business on such trips or not. He paid his own expenses and was not reimbursed for any portion thereof by petitioner. Petitioner offered no evidence relating to compensation paid by other concerns for services comparable to those performed by Rabkin and Itkoff. We agree with respondent that the amount paid and deducted by petitioner as management fees during each of the taxable years involved is unreasonable and excessive. We agree with petitioner, however, that in the absence of any payments of salaries or directors fees, as such, reasonable compensation for the services performed by petitioner's officers should include something more than the fees paid under an ordinary real estate management contract. Cf. Express Publishing Co. v. Commissioner, 143 Fed. (2d) 386;*201 Canal Navigation & Trading Co. v. Commissioner, 168 Fed. (2d) 512. Moreover, the resolution of the Board of Directors under which the "management fees" were paid specifically provided that they should be "for such other services" as might be rendered to the corporation. Considering all the facts and circumstances and exercising our best judgment, we have found as a fact and now hold that reasonable compensation for the services of petitioner's officers, Rabkin and Itkoff, in the management of its business, for each of the taxable years involved, is $4,000, or $2,000 to each. Petitioner also argues that the compensation paid to Rabkin during the years in issue was in part compensation for past services and that this should be taken into consideration, citing Lucas v. Ox Fibre Brush Co., 281 U.S. 115. In that case the Supreme Court allowed the taxpayer to deduct salaries in the year paid which were in part compensation for services performed in prior years. The Government did not dispute that such compensation was reasonable for such prior years' services. In the instant case, the record shows that Rabkin and Itkoff each have received at least $2,000 compensation*202 during each of the years since the beginning of petitioner's existence and it does not appear from the record that this amount was inadequate. The petitioner has failed to show that any part of the payments involved herein constitute reasonable compensation for such prior years' services and has accordingly failed to bring itself under the principle of the Ox Fibre case. Decision will be entered under Rule 50. Footnotes1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *(b) Interest. - All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter.↩2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In general. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩