HARKINS BOWLING, Inc., a Minnesota Corporation, Plaintiff,

v.

Arthur R. KNOX, District Director of Internal Revenue for the District of Minnesota, Defendant.

Civ. No. 3024.

United States District Court
D. Minnesota,
Third Division.

Aug. 22, 1958.

Joseph A. Maun, William R. Busch and Lee N. Johnson, St. Paul, Minn. (Bundlie, Kelley & Maun, St. Paul, Minn., of counsel), for plaintiff.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, Lyle M. Turner and Sheldon J. Gitelman, Attys., Dept. of Justice, Washington, D. C., George E. MacKinnon. U. S. Atty., St. Paul, Minn., for defendant.

DONOVAN, District Judge.

In this action plaintiff seeks to recover income taxes and interest paid pursuant to a deficiency assessment. Taxpayer, a corporation, deducted interest payments on notes in the amount of $109,650, issued by it to its sole stockholders. The deductions were taken by the taxpayer under authority of § 23(b) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(b) (hereinafter referred to as the Act), which allows as a deduction from gross income all interest paid in the tax year on "indebtedness." The Director determined that the $109,650 constituted a contribution to capital and the payments, in fact, were dividends. On that basis the deductions taken in the tax years ending August 31, 1952, 1953 and 1954, were disallowed by the Director.

The material facts and evidence disclose that Thomas J. Harkins had successfully operated a bowling alley on leased premises since 1920. He enjoyed a reputation as an outstanding bowler and as a sponsor of nationally recognized bowling events in St. Paul. In 1945 Harkins was given notice to quit the premises. He determined to continue in business elsewhere, and for want of other suitable rental locations decided to construct his own. On this venture he sought the aid of Charles W. Goodrich, who agreed to enter partnership with Harkins, the proprietary interest to be divided, 70 per cent in Harkins, and 30 per cent in Goodrich.

Upon advice of an attorney, Harkins and Goodrich decided to incorporate because of the large amount of tangible property which would be connected with the enterprise. The taxpayer, Harkins Bowling, Inc., was incorporated on March 25, 1946, under the laws of Minnesota, with authority to issue 1000 shares of common and 250 shares of preferred stock. Harkins purchased 700 shares of common for $700, and Goodrich purchased the remaining 300 shares of common for $300. No preferred stock has been issued. Harkins and Goodrich became officers and directors of the taxpayer.

Taxpayer entered contract with one Lovering to construct a building on terms of cost plus a seven per cent fee. The building estimate was $208,000. A contract was also executed for the purchase of bowling equipment in the amount of $59,000 on terms of one third down and the balance to be paid monthly after operations began. The taxpayer was authorized by its board of directors to purchase real property in downtown St. Paul from Harkins and Goodrich. These men had purchased the land individually prior to the incorporation of taxpayer, and received no profit from the sale. The purchase price was set at $52,500. In all, assets of approximately $280,000 would be needed to get taxpayer into operation.

Financing was arranged in the following manner:

(a) $1,000 from sale of stock;

(b) $190,000 on note and mortgage given the Minnesota Federal Loan Association of St. Paul (this loan given on the condition that Harkins and Goodrich have "an equity" of $90,000 in the taxpayer); and

(c) $90,000 from Harkins and Goodrich.

Harkins transferred $35,000 in property to the taxpayer and advanced $25,000 in cash. Goodrich transferred $17,500 in property and advanced $12,500 in cash to the taxpayer. On April 1, 1946, taxpayer issued promissory notes in the amount of $60,000 to Harkins and $30,000 to Goodrich.

Taxpayer was ready to commence operations on March 14, 1947. The cost of construction had come to $291,000. A second mortgage was given Minnesota Federal Loan Association on a loan of $41,000. Harkins and Goodrich made

additional advances for which taxpayer issued notes, and other loans were obtained. At the end of the taxpayer's fiscal year, August 31, 1947, its books revealed notes payable as follows:

| | | |
|---|---|---|
| (a) Harkins | $75,450 | |
| Goodrich | 34,200 | |
| | | $109,650[1] |
| (b) To others | | 16,700 |
| (c) To banks, | | |
| secured | $231,000 | |
| unsecured | 9,000 | |
| | | 240,000 |
| Total | | $366,350 |

The enterprise has been successful. Taxpayer's secured debt has been reduced from $231,000 to $119,000 by August 31, 1954. At that date unsecured bank loans amounted to $12,182.20. The notes held by others than Harkins and Goodrich on August 31, 1947, were paid when due or shortly thereafter with the exception of one note for $1,700 which was paid thirteen months after due date. The last of such notes was retired November 24, 1948. Interest in the amount of $49,279.46 has been paid on the notes held by Harkins and Goodrich through August 31, 1954. A breakdown of the interest payments is set out in a footnote.[2] No dividends have been declared. No demand for payment was made by Harkins or Goodrich on notes which had become due, although Goodrich testified in the hypothetical that he would have so demanded payment even had it meant bankruptcy for the taxpayer. With the exception of one note in the amount of $1,450, none of the notes held by Hark-

[1].

| Date Issued | Amount | Payee | Due Date | Date Paid | Interest Rate |
|---|---|---|---|---|---|
| 5/1/46 | $55,000 | Harkins | 5/1/56 | * | 6% |
| 5/1/46 | 5,000 | " | 5/1/56 | * | " |
| 10/14/46 | 4,000 | " | 10/14/47 | * | " |
| 3/29/47 | 1,450 | " | 3/29/48 | 1/8/48 | " |
| 6/2/47 | 10,000 | " | 6/2/57 | * | " |
| 5/1/46 | 30,000 | Goodrich | 5/1/56 | 5/12/54 | " |
| 3/29/47 | 1,950 | " | 3/29/48 | 5/12/54 | " |
| 6/12/47 | 750 | " | 6/12/48 | 5/12/54 | " |
| 7/9/47 | 1,500 | " | 7/9/48 | 3/10/53 | " |

* Unpaid at date of trial, February 17, 1958.

[2].

| Fiscal Year | Harkins | | Goodrich | |
|---|---|---|---|---|
| | Paid | Accrued | Paid | Accrued |
| 1946 | $ — | $1,200.00 | $ — | $ 600.00 |
| 1947 | — | 3,886.25 | — | 1,882.50 |
| 1948 | — | 4,470.93 | 1,648.78 | 2,065.70 |
| 1949 | 12,200.00 | 4,440.00 | 2,619.00 | 2,097.16 |
| 1950 | 4,797.18 | 4,440.00 | 2,119.45 | 2,076.00 |
| 1951 | 1,440.00 | 4,440.00 | 4,410.13 | 2,076.00 |
| 1952 | 4,440.00 | 4,822.67 | 2,111.75 | 2,111.75 |
| 1953 | 4,822.67 | 5,175.00 | 2,123.50 | 2,123.50 |
| 1954 | 5,175.00 | 5,770.73 | 1,372.00 | 1,372.00 |
| | $32,874.85 | $38,645.58 | $16,404.61 | $16,404.61 |
| Unpaid | 5,770.73* | | | |
| | $38,645.58 | $38,645.58 | $16,404.61 | $16,404.61 |

* Pursuant to board of directors' resolution on August 30, 1954, this interest payment was waived by Harkins. That this item is not deductible is conceded by taxpayer.

ins has been paid. On May 12, 1954, Goodrich sold his 300 shares of common stock to the taxpayer for $34,500. The taxpayer issued serial notes for the purchase price. At the same time the taxpayer paid off $32,700 in notes then outstanding to Goodrich. This payment was financed by a loan to the taxpayer by Harkins Driving Tees in the amount of $30,500 for which taxpayer issued its note. Harkins Driving Tees was a business owned and operated by Harkins in sole proprietorship.

■ The Director's determination that the advances made by Harkins and Goodrich to the taxpayer were contributions to capital, carries with it into this court a presumption of correctness.

The taxpayer earnestly contends that the evidence establishes the creation of a valid and enforceable debt, and that the Director may not. upset subsisting legal transactions by virtue of the fact that taxpayer's debt structure is large in comparison to its capital structure.

The Director, in turn, contends that the evidence establishes the intent of Harkins and Goodrich to contribute equity capital at the inception of the corporation, although the advances were characterized as debts.

■ Harkins' and Goodrich's transactions with the taxpayer are evidenced by promissory notes. It is undisputed that these notes carry the characteristics of debt instruments and that no ambiguity appears on their face. The important consideration here is not the intent of the parties, since their intent has been objectively manifested in the notes. The important consideration is rather "whether the intent and acts of these parties should be disregarded in characterizing the transaction for federal tax purposes." [3]

■ Tax incidents attach to the substance of a transaction and not to its form. The meaning of words is determinable by the context in which they are used. "Thus, 'indebtedness' as used in a federal taxation statute may not carry the same meaning as the same word used in the context of corporate finance." [4] Determination as to whether advances to a closely knit organization (as the taxpayer in the instant case), may properly be treated as loans for tax purposes must be arrived at by resort to consideration of the intent of Congress. The significant factor, in the minds of the framers of the Act, is "whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business." [5]

The issue before the court, then, is whether the transactions constitute an "indebtedness" within the meaning of the Act. Any factor bearing upon the element or degree of risk involved becomes important. Such factors as appear in this case are these:

(1) Thin capitalization;

(2) Use to which the funds advanced were put;

(3) Advances proportional to equity interest;

(4) Whether third parties would make such advances;

(5) Expectation of repayment.

*(1) Thin Capitalization.*

The taxpayer was launched with nominal capital investment of $1,000. Its debt at the end of its first year of operation was $366,350 of which $109,650 was owed to the corporation's sole stockholders. The ratio of the stockholders' debt interest to their capital interest was approximately 109 to 1. In determining a debt-equity ratio, real and not book value of the capital investment must be used.[6] Taxpayer's success was in some degree attributable to the business ex-

3. Kraft Foods Co. v. Commissioner, 2 Cir., 232 F.2d 118, 123, 126.

4. Ibid., at page 123.

5. Gilbert v. Commissioner, 2 Cir., 248 F.2d 399, 406.

6. Kraft Foods Co. v. Commissioner, supra; Miller's Estate v. Commissioner, 9 Cir., 239 F.2d 729, reversing 24 T.C. 923; Sheldon Tauber v. Commissioner, 24 T.C. 179.

perience of Harkins. Nor can his reputation in bowling circles be discounted. The evidence shows that he pioneered the development of "bowling leagues" in St. Paul, and that bowling leagues constituted a major source of revenue to the taxpayer. It is not clear that the parties placed any valuation upon this good will and experience. The only evidence of its probable value is that eight years after incorporation the taxpayer paid approximately $115 a share for Goodrich's 300 shares of a par of $1. This price reflected the inflated value of the taxpayer's assets and the waiver of a year's salary by Goodrich. It also reflected eight years of successful operation of the enterprise, a fact which could not have been predicted with certitude at the outset of the venture.[7] The circumstances surrounding the sale further cloud the weight to be given to the amount of the sale price. The stock was paid for by issuance of notes so that Goodrich remained a creditor of the taxpayer for substantially the same amount as before the sale. The taxpayer found it necessary to borrow $30,500 to finance the retirement of the notes held by Goodrich. The net effect of the sale was to increase the taxpayer's debt structure by substantially the amount of cash realized by Goodrich.

■ A finding of thin capitalization is not sufficient of itself to justify the Director in disregarding an existing debtor-creditor relationship[8], but neither can it be wholly disregarded in determining the degree of risk attaching to an advance made under such circumstances.[9]

*(2) Use to Which the Advances Were Put.*

At the date of incorporation of taxpayer, it was evident that Harkins and Goodrich would have to invest $90,000 in taxpayer in order that the taxpayer could purchase the assets necessary for operation. Within the first year of its existence $19,650 more was advanced to cover increased costs in acquiring assets and for working capital. This factor is a significant one in determining whether the advances were placed at the risk of the venture or were made with full expectation of repayment without regard to the success or failure of the venture. While authority exists for the proposition that this factor may be considered only where thin capitalization is found,[10] it is of no consequence here since taxpayer was thinly capitalized.

*(3) Advances Proportional to Equity Interest.*

■ Prior to incorporation of taxpayer, Harkins and Goodrich had agreed to share proprietary interest in the venture 70 per cent and 30 per cent, respectively. This was the percentage investment in taxpayer's stock, and it was roughly the percentage in which advances were made to the taxpayer. An arrangement "to keep 'loans' proportioned to acknowledged risk capital is indicative that the funds 'loaned' were understood to have been placed at the risk of the business."[11]

*(4) Whether Third Parties Would Make Such Advances.*

7. Compare: Miller's Estate v. Commissioner, supra.

8. Rowan v. United States, 5 Cir., 219 F.2d 51; Sun Properties v. United States, 5 Cir., 220 F.2d 171.

9. John Kelley Co. v. Commissioner, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278; Root v. Commissioner, 9 Cir., 220 F.2d 240; Gilbert v. Commissioner, supra; Mullin Building Corp. v. Commissioner, 9 T.C. 350, affirmed 3 Cir., 167 F.2d 1001; Izador Dobkin v. Commissioner, 15 T.C. 31, affirmed 2 Cir., 192 F.2d 392;

Bair v. Commissioner, 16 T.C. 90, affirmed, 2 Cir., 199 F.2d 589; Gunn v. Commissioner, 25 T.C. 424; Colony, Inc., v. Commissioner, 26 T.C. 30, affirmed on another ground, 6 Cir., 244 F.2d 75, reversed on another ground, 357 U.S. 28, 78 S.Ct. 1033, 2 L.Ed.2d 1119.

10. Wilshire & Western Sandwiches, Inc., v. Commissioner, 9 Cir., 175 F.2d 718; Gilbert v. Commissioner, supra, Waterman, J., concurring.

11. Gilbert v. Commissioner, supra, 248 F. 2d at page 407.

The record shows that Minnesota Federal Loan Association was willing to advance money to the taxpayer upon security of a mortgage only if Harkins and Goodrich would have an investment of $90,000 in the taxpayer. Whatever name was given to this investment, it is apparent that the secured creditor wished more than $1,000 placed at the risk of the venture before it would place funds at the taxpayer's disposal.

Of the $16,700 loaned by others to the taxpayer, more than half was loaned by friends and relations of Harkins and Goodrich. The remainder represented serial notes to Lovering, the contractor, in part payment of his fee. An additional unsecured loan of $9,000 was obtained from a bank. While such debts indicate a willingness on the part of third parties to loan money to the taxpayer, they are not persuasive under the circumstances of the fact that persons having no proprietary interest in the taxpayer would be willing to transfer $52,500 by way of realty and $57,150 by way of cash for the notes of a corporation with only $1,000 in capital.

#### (5) Expectation of Repayment.

Of the advances made by Harkins and Goodrich, nearly half represented transfer of realty. Most of the remainder financed the purchase of bowling equipment and paid a portion of the cost of constructing the building which was to house taxpayer's operations. The rest provided a portion of the working capital. More than half, then, in land and cost of the building came under the mortgage to Minnesota Federal Loan Association. From earnings the salaries of Harkins and Goodrich, of employees and the remainder of the contract price on the bowling equipment had to be met each month in addition to other operating costs. The corporation had no paid in surplus, and at the end of its first fiscal year had no earned surplus. The notes held by Harkins and Goodrich could be paid only from earnings, but it is obvious that unless these men were willing to jeopardize the financial condition of the taxpayer, the secured debt and the debt for bowling equipment would have first call at earnings. Expectation of repayment of their notes hinged upon large earnings. There is no evidence that Harkins' previous experience in the bowling business justified expectation of repayment under these conditions.

With the exception of two notes, no demand for payment was made when notes fell due. Although failure to make prompt demand for payment does not of itself change the character of an existing debt[12], it is not without evidentiary force on the factor of reasonable expectation of repayment. Of the $109,650 owed to Harkins and Goodrich, $100,000 was represented by notes payable in ten years from issue, in 1956 and 1957. The taxpayer did not fund this debt. It is difficult to conclude that the sole stockholders in making these advances expected the taxpayer to retire $90,000 in notes due April 1, 1956, and $10,000 in 1957, in addition to meeting its other obligations. The outstanding notes held by Harkins are all past due. Through a business owned in sole proprietorship, Harkins had advanced an additional $33,500 to the taxpayer by the end of its fiscal year, August 31, 1954. On the same date he waived payment of interest due him for the fiscal year 1954 in order to facilitate taxpayer's purchase of Goodrich's interest. In this purchase all notes held by Goodrich were retired by cash payment, but in taking notes in the amount of the purchase price of his stock, Goodrich remained a creditor of the corporation in substantially the same amount as before. These facts and omissions, occurring as they do after the advances were made, ordinarily would be of questionable weight upon the question of reasonable expectation of repayment at the time of the advances, but here the enterprise has been successful. There is no evidence that Harkins and Goodrich expected any greater success

12. Wilshire & Western Sandwiches, Inc. v. Commissioner, supra.

than that achieved. Furthermore, nothing has occurred to alter the expectations of these men as to the prospects for their enterprise. Although the cost of the building exceeded the estimate by some $83,000, Harkins and Goodrich were fully appreciative of this contingency when they made the advances to the taxpayer. The court concludes that the advances were made without reasonable expectation that repayment would be had at maturity of the notes.[13]

■ From the fact that the debt-equity ratio stood at 109 to 1, the fact that the advances were used by the taxpayer to acquire the assets it needed to commence operations and for working capital, the fact that the advances were proportional to the equity interest in the taxpayer, the fact that disinterested parties would not make like advances under the circumstances, and the fact that Harkins and Goodrich could not reasonably expect repayment, but rather subordinated their "loans" to the claims of "other" creditors, the court concludes that the $109,650 advanced by Harkins and Goodrich was placed at the risk of the business.

Upon the whole of the evidence, the taxpayer has failed to establish an "indebtedness" within the meaning of § 23(b) of the Act to the extent necessary

to overcome the presumption that the finding of the Director is correct.[14] The evidence is such as to sustain the Director's determination that these advances constituted contributions to capital for tax purposes.[15]

Defendant may submit findings of fact, conclusions of law, order for, and form of judgment.

Plaintiff is allowed an exception.

---

13. Harkins and Goodrich testified that the reason that they made loans to the taxpayer rather than purchase additional stock was, in Goodrich's words, because they could not get a firm bid on construction of taxpayer's building, "and realizing, of course, that * * * [the building contractor] wasn't bound by any figure, the cost might increase, and that being the case, then I wondered what we would do for additional money in case we needed it. So I decided at that time to incorporate for 1000 shares of stock at a dollar a share, and the remainder of the money that went into the corporation would be in the form of notes to both Tom and myself, I mean, Mr. Harkins and myself, and then if worse came to worse, we could take these notes to the bank and borrow money.

"Q. Why couldn't you borrow it just as well on the stock? A. Stock in a

corporation under a corporation loan like that, in a new corporation, is not acceptable as collateral in a bank."
This testimony is corroborated by a letter dated May 25, 1946, addressed to Harkins by Goodrich. Goodrich had had many years of experience in the investment field. Although the contingency which underpinned the financial structure chosen for taxpayer came to pass, the notes held by Harkins and Goodrich were not hypothecated.

14. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212.

15. Root v. Commissioner, supra; Camp Wolters Enterprises v. Commissioner, 5 Cir., 230 F.2d 555, affirming 22 T.C. 737; Janeway v. Commissioner, 2 T.C. 197, affirmed, 2 Cir., 147 F.2d 602; Bair v. Commissioner, supra; Colony, Inc., v. Commissioner, supra.