LEACH CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57494. Filed June 12, 1958.

*John B. Milliken, Esq.*, and *Harrison Harkins, Esq.*, for the petitioner.

*Sidney J. Machtinger, Esq.*, for the respondent.

The respondent determined the following deficiencies in income tax of petitioner:

| Taxable year | Amount |
|---|---|
| Apr. 22 1949 to Feb. 28, 1950 | $7,719.94 |
| Fiscal year ended Feb. 28, 1951 | 9,666.70 |
| Fiscal year ended Feb. 29, 1952 | 35,634.39 |

The petitioner contends that it overpaid its tax for each of the periods listed above and that it is entitled to a refund.

The parties have entered into stipulations relating to issues involving the amount of depreciation allowable for each year, and also the amount of capital gain or loss on machinery and equipment sold during the year ended February 29, 1952. These issues will be disposed of under Rule 50.

The remaining issues are (1) whether amounts accrued as interest on bonds in each of the taxable years are deductible, and (2) whether petitioner is entitled to annual deductions for amortized portions of fees and expenses incurred in connection with the issuance of the bonds. The amounts involved in these issues are as follows:

| Taxable year | Interest on bonds | Amortization of fees and expenses |
|---|---|---|
| Apr. 22, 1949 to Feb. 28, 1950 | $16,168.00 | $4,147.63 |
| Year ended Feb. 28, 1951 | 18,833.19 | 8,463.96 |
| Year ended Feb. 29, 1952 | 17,599.92 | 4,381.32 |

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are incorporated herein by reference.

The petitioner is a corporation organized under Delaware law on April 22, 1949; and is the surviving corporation incident to a statutory merger, to which petitioner and Leach Relay Co., a California corporation (hereinafter sometimes called Leach of California), were the parties.

The original corporate name of petitioner was Leach Relay Co., but on February 26, 1954, its name was changed to Leach Corporation.

Petitioner's principal business office is in Los Angeles, California. It filed its tax returns, on an accrual basis, for the taxable years (the period April 22, 1949, to February 28, 1950, and the fiscal years ended February 28, 1951, and February 29, 1952) with the then collector of internal revenue for the sixth district of California at Los Angeles, California.

In February of 1946, Joseph F. Clark acquired control of Leach of California, a then dormant corporation, and this corporation acquired by purchase the inventory, fixed assets and unfilled orders of an operating electrical relay manufacturing business.

An electrical relay may be described as an electro-magnetic contact-making or contact-breaking device, operated by a variation in the condition of one electric current to affect the operation of switches or devices operating in the same, or a different, electric current. A common use for electrical relays is to operate, by remote control, switches and devices in airplanes.

Joseph F. Clark owned all of the issued and outstanding stock of Leach of California, which consisted of 2,000 shares of no-par stock with a stated value on the books of $20,000, or $10 per share.

G. L. Ohrstrom & Co., a partnership, was an investment banking firm, located in New York, which specialized in acquiring industrial companies, and the placing of the securities of such companies with its clients. It also had a staff experienced in industrial management to supervise the management of acquired companies. George L. Ohrstrom (who died in November of 1955) was the general partner in the firm, and there were several special partners.

Robert Benson, Lonsdale & Co. Limited, and Robert Fleming & Co. Limited (hereinafter referred to as Benson Limited and Fleming Limited respectively), are English investment banking houses located in London, England, which specialize in placing investments in American securities. The two firms have operated in financing American investments for about 70 years.

Benson Limited and Fleming Limited invest money on behalf of clients, both institutional and private, but chiefly institutional clients in the form of English and Scottish investment trusts. An investment trust is a trust company formed for investment purposes with a managing board of four or five directors. In some, but not all cases, the English and Scottish investment trusts of interest in this proceeding had a member of Benson Limited or Fleming Limited on their boards of directors to render financial advice, but the function of Benson Limited and Fleming Limited in this regard was simply to advise and recommend investments to the trusts as specialists in American securities, and the boards of directors of the investment trusts independently established their own investment policies.

Benson Limited and Fleming Limited had had business relations with George L. Ohrstrom and G. L. Ohrstrom & Co. for some 30 years, and they had bought a great number of securities through the Ohrstrom Co. The English firms had great confidence in G. L. Ohrstrom & Co. and its managerial abilities, and they were interested in any investment recommended by it, in cases where the management of the continuing operations of the subject company would be supervised by Ohrstrom & Co.

G. L. Ohrstrom & Co., became interested in acquiring the relay business operated by Leach of California. It first sought to purchase the land, buildings, and operating assets of that corporation. Joseph F. Clark refused to negotiate on the basis of a sale of assets, but was agreeable to a sale of the capital stock of Leach of California for $620,000, of which $520,000 was to be paid in cash and the remainder by notes.

Sometime prior to April 11, 1949, George L. Ohrstrom entered into negotiations with representatives of Benson Limited and Fleming Limited with the object of securing funds to finance the venture. He apprised them of what Leach of California had done and was doing, and showed them its balance sheet for the year ended February 28, 1949. The balance sheet disclosed that its assets, liabilities and net worth on that date were as follows:

### ASSETS

| | | |
|---|---:|---:|
| Current assets | | $381,673.06 |
| Fixed assets (net book value): | | |
| Land | $8,515.50 | |
| Buildings | 31,480.32 | |
| Other fixed assets | 31,542.58 | |
| Total | | 71,538.40 |
| Other assets (exclusive of good will) | | 17,815.71 |
| Total assets | | 471,027.17 |

### LIABILITIES AND NET WORTH

| | | |
|---|---:|---:|
| Current liabilities (including reserve for Federal income taxes $116,464.85) | | $162,042.35 |
| Net worth: | | |
| Capital stock—Authorized 2,500 shares of no par value—issued and outstanding 2,000 shares | $20,000.00 | |
| Earned surplus: | | |
| Balance Mar. 1, 1948 | $99,540.83 | |
| Add—Net profit year ending Feb. 28, 1949, after provision for Federal income taxes | 189,443.99 | |
| Balance Feb. 28, 1949 | 288,984.82 | |
| Total net worth | | 308,984.82 |
| Total liabilities and net worth | | 471,027.17 |

Ohrstrom told the representatives of the two English banking houses that, with orders in hand, the prospect was that the future earnings of the business would be about $240,000 per year.

At that time certain foreign exchange control policies of Great Britain were being administered by the Bank of England and permission had to be obtained from the Bank of England by British residents before investment in securities of a foreign corporation could be made. The general policy of the Bank of England was not to permit the English banking houses or their investment-trust clients to invest in stock, common or preferred, of an American corporation whose stock was not traded on a recognized stock exchange, and not to permit a loan to be made to such a corporation that was not secured by a mortgage. The Bank of England did not require that mortgaged assets have a value equivalent to the amount of a loan.

Benson Limited and Fleming Limited were aware of the policy of the Bank of England and told Ohrstrom that neither they nor their investment-trust clients would be interested in the stock of a small California corporation which was not listed on any stock exchange, and that, in any event, the Bank of England would not permit the purchase of such stock. A plan was finally formulated which met with the approval of the two English banking houses. Under this plan a new Delaware corporation was to be organized and used to effectuate the acquisition of the stock of Leach of California. Its initial capital stock was to be 1,000 shares of common stock having a par value of $1 per share. Within a short time its capital stock was to be increased to 105,000 shares of the same par value. It was to issue 5 per cent first mortgage bonds in the amount of $400,000, payable on or before December 1, 1956, which were to be secured by a first mortgage or deed of trust on its land and buildings and were to contain a provision for mandatory redemption, from time to time, through the operation of a sinking fund accumulated from 80 per cent of its net earnings. Benson Limited and Fleming Limited were to purchase these bonds for $400,000 and acquire 500 shares of its initial capital stock for $1 per share. Ohrstrom and his associates were to acquire a controlling interest of approximately 52 per cent of the stock (500 shares of the initial issue and 50 shares to be issued shortly thereafter) for $550. When the purchase of the stock of Leach of California was consummated, its business and assets were to be acquired by the new corporation. Joseph F. Clark was to be retained as its president and placed in charge of all of its operations, subject to George L. Ohrstrom's supervision as chairman of its board of directors.

Benson Limited and Fleming Limited applied to the Bank of England for permission to make an investment of $400,000 in bonds of the new Delaware corporation and of $500 in its stock, and the bank gave its consent to these investments.

One of the factors which induced the two English banking houses to obligate themselves to purchase the bonds was that they were to receive 500 shares of stock for a nominal amount. It was their intention to sell the bonds to their investment-trust clients, and they were satisfied that the bonds, with shares of stock as an added feature, would be a good investment for their clients. They would not have recommended that their clients invest in the bonds without the shares of stock. However, they were content to let the Ohrstrom group acquire majority stock control, because, among other reasons, neither they nor their clients desired management control of foreign business investments, and they were not equipped to assume management control of industrial operations.

On April 11, 1949, Joseph F. Clark as the "seller" and G. L. Ohrstrom & Co. as the "purchaser" entered into a written "Stock Purchase Agreement" for the sale and purchase of the 2,000 shares of the capital stock of Leach of California. The agreed consideration to be paid for the stock was $620,000, payable as follows:

(a) $520,000 in cash at closing.
(b) The balance, $100,000, to be represented by four notes as follows:
    (1) A non-interest bearing note for $25,000 due June 10, 1949.
    (2) Three notes of $25,000 each, dated as of date of closing, bearing 5 per cent per annum interest, and payable on or before six, twelve and eighteen months respectively from the date of the note.

The stock purchase agreement stated as part of its terms that the purchaser represented he would assign the agreement rights to a corporation formed or to be formed and that such "assignee of purchaser shall have funds in cash of at least $400,000.00 which may be represented by secured debt of such assignee and may at the option of such assignee become an encumbrance upon the stock being sold hereunder, the company or its assets which may be evidenced by a trust deed (mortgage) of or on the land and buildings." The agreement also provided that the $400,000 cash funds be paid to the seller as part of the purchase price.

The agreement further provided that the purchaser "may at any time assign this agreement and all its rights and obligations hereunder to a corporation (organized or to be organized) which shall assume all the purchaser's rights and obligations hereunder; and upon such assignment the purchaser shall thereupon be relieved and released of all obligations and liability hereunder to the seller under any of the covenants, terms or conditions of this agreement."

G. L. Ohrstrom & Co. caused the petitioner to be incorporated under the laws of Delaware on April 22, 1949; and on April 26, 1949, G. L. Ohrstrom & Co. assigned to the petitioner all of its rights and obligations under the Stock Purchase Agreement.

The initial authorized capital stock of petitioner consisted of 1,000 shares with a par value of $1 per share, and on April 25, 1949, petitioner issued to Albert Boustead all of its capital stock (1,000 shares) for $1,000 in cash. The shares were issued in the name of Boustead as nominee for the persons, other than himself, who were, or were to become, the beneficial owners of the shares. Albert Boustead was an associate of G. L. Ohrstrom & Co.

In order to pay Joseph F. Clark the $520,000 in cash required by the terms of the Stock Purchase Agreement it was necessary to obtain some interim financing from the Bank of America. On May 2 or 3, 1949, Vernon R. Y. Lynn, president of the petitioner, applied to this bank for a loan of not to exceed $225,000. The bank requested assurance that the $400,000 of bonded indebtedness would at all times be subordinate to the claim of the bank in connection with the proposed loan. On May 3, 1949, the board of directors of petitioner adopted a resolution that no bonds or pledge of security of any of the assets of the corporation would be issued or granted in connection with the bond issue of $400,000 until the indebtedness to the Bank of America in connection with the interim financing had been paid, and the bank received the requested assurance. On May 6, 1949, petitioner borrowed $170,000 from the Bank of America for a 10- or 12-day period as an interim "closing loan" for use in purchasing the stock of Leach of California. This money was repaid to the bank on May 12, 1949.

On May 5 and 6, 1949, the petitioner received $400,000 from Benson Limited and Fleming Limited.

On May 5, 1949,[1] the petitioner acquired all of the capital stock of Leach of California pursuant to the terms of the Stock Purchase Agreement, for a cash payment of $520,000, plus the issuance to Joseph F. Clark of four promissory notes, each dated May 5, 1949, and each in the amount of $25,000. The due date of the first note was June 10, 1949, and the other three notes were dated May 5, 1949, and were due on or before 6, 12, and 18 months, respectively, from May 5, 1949. Leach of California was merged into petitioner as of the close of business on May 6, 1949.

The balance sheet of Leach of California at May 6, 1949, prior to merger, was as follows:

ASSETS

Current assets:
Cash _____ $227, 755. 87
Accounts receivable less reserve_____ 118, 381. 42
Inventories _____ 131, 288. 29

  Total current assets_____ $477, 425. 58

[1] The stipulation of the parties fixes May 5, 1949, as the date of acquisition of the stock. However, since the bank loan and the transfer of funds from Benson Limited and Fleming Limited were not completed until May 6, 1949, it may be that the stipulated date is based on a typographical error, or that the parties treated May 5, 1949, as the date of acquisition, notwithstanding that the event may have occurred in fact shortly thereafter.

Fixed assets (net book value):

| | |
|---|---:|
| Land | $8, 515. 50 |
| Buildings | 31, 261. 91 |
| Furniture and fixtures | 6, 311. 59 |
| Machinery and equipment | 12, 477. 10 |
| Dies and jigs | 14, 520. 89 |
| Automobiles and trucks | 2, 141. 93 |
| Patents | 0 |

| | |
|---|---:|
| Total fixed assets | $75, 228. 92 |
| Other assets | 6, 365. 98 |
| Total assets | 559, 020. 48 |

LIABILITIES AND NET WORTH

Current liabilities:

| | |
|---|---:|
| Accounts payable—trade | $34, 334. 74 |
| Salaries, wages, commissions | 16, 603. 31 |
| Christmas bonus | 2, 932. 25 |
| Payroll taxes and insurance | 6, 189. 84 |
| State franchise tax | 10, 619. 84 |
| Other taxes | 6, 241. 56 |
| Reserve Federal income tax | 138, 019. 86 |

| | |
|---|---:|
| Total current liabilities | $214, 941. 40 |

Net worth:

| | |
|---|---:|
| Capital stock (authorized 2,500 shares no par) issued and outstanding, 2,000 shares | 20, 000. 00 |
| Earned surplus | 324, 079. 08 |
| Total liabilities and net worth | 559, 020. 48 |

The amount paid and payable by petitioner in acquiring the stock of Leach of California ($620,000), plus capitalized expenditures incurred in the purchase transaction, was $278,420.92 in excess of the book value of the net assets of Leach of California.

The cost bases to the petitioner at May 7, 1949, of the assets listed below which it had acquired from Leach of California were as follows:

| | |
|---|---:|
| Land | $16, 000. 00 |
| Buildings | 64, 000. 00 |
| Office equipment and furniture | 20, 798. 00 |
| Shop machinery and equipment | 46, 301. 00 |
| Shop fixtures | 14, 483. 00 |
| Dies and jigs | 63, 000. 00 |
| Automobiles and trucks | 2, 880. 00 |
| Subtotal | 227, 462. 00 |
| Goodwill | 126, 187. 84 |
| Total | 353, 649. 84 |

On May 9, 1949, George L. Ohrstrom was elected chairman of the board of directors of petitioner, and Joseph F. Clark was elected president. They served in these capacities during the taxable years involved in this proceeding.

On July 19, 1949, the petitioner increased its authorized capital stock to 105,000 shares with a par value of $1 per share.

On July 28, 1949, Elizabeth J. Ohrstrom, Margaret H. Cavanaugh, H. T. Cavanaugh, Gretchen Stubbs, and Merrill Stubbs became the holders of record of 500 of the 1,000 shares of common stock originally issued on April 25, 1949, in the name of Albert Boustead. On the same date, July 28, 1949, the petitioner issued to Albert Boustead 50 shares of its common stock for $50 in cash, and he was the beneficial owner, as well as the record owner of these shares. These individuals, hereinafter referred to as the Ohrstrom Group, were partners and associates, and the wives of partners and associates, of the New York partnership of G. L. Ohrstrom & Co. This group, on July 28, 1949, owned 52.38 per cent of the issued and outstanding stock of petitioner, but was not at any time material herein the owner of record or the beneficial owner of any of its bonds. The remaining 47.62 per cent of the capital stock of petitioner (500 shares of its initial issue) was acquired for $500 by the British Group (composed of Benson Limited and Fleming Limited and their clients), and it acquired all of petitioner's bonds.

The stock and bonds of petitioner held by the British Group were registered in "street names," and were beneficially owned by persons resident in Great Britain. "Street names" are names used by banks, brokerage houses, and the like, to hold of record securities in their custody which are beneficially owned by their clients.

The following companies became the holders of record of 500 of the 1,000 shares of common stock originally issued on April 25, 1949, in the name of Albert Boustead, on the dates and in the amounts listed below:

| Date | | Number of shares |
|------|---|---|
| May 10, 1949 | Cudd & Co | 38¾ |
| May 10, 1949 | Grace Church Co | 18¾ |
| May 10, 1949 | Clark, Dodge & Co | 30 |
| May 10, 1949 | C. A. England & Co | 20 |
| May 10, 1949 | Egger & Co | 12½ |
| July 28, 1949 | Shaw & Co | 380 |

On December 6, 1949, the petitioner paid a stock dividend of 103,950 shares to its stockholders of record.

On February 21, 1950, Shaw & Co. made the following transfers of stock:

| | Shares |
|---|---|
| To Wonham, Albert & Co | 23,750 |
| To Suydam & Co | 750 |
| To Egger & Co | 3,750 |

Prior to February 21, 1950, the percentage of ownership of record of shares of stock and bonds of petitioner, by the eight companies, was not in direct proportion. On February 21, 1950, their respective holdings of record among themselves were in direct proportion, and were as follows:

| Record holder | Stock | | Bonds | |
|---|---|---|---|---|
| | Total shares | Percentage | Amount | Percentage |
| Cudd & Co | 3,875 | 7¾ | $31,000 | 7¾ |
| Grace Church Co | 1,875 | 3¾ | 15,000 | 3¾ |
| Clark, Dodge & Co | 3,000 | 6 | 24,000 | 6 |
| C. A. England & Co | 2,000 | 4 | 16,000 | 4 |
| Egger & Co | 5,000 | 10 | 40,000 | 10 |
| Shaw & Co | 9,750 | 19½ | 78,000 | 19½ |
| Suydam & Co | 750 | 1½ | 6,000 | 1½ |
| Wonham, Albert & Co | 23,750 | 47½ | 190,000 | 47½ |
| Totals | 50,000 | 100 | 400,000 | 100 |

While there was no requirement that the stock and bonds be passed on to the clients of Benson Limited and Fleming Limited in exact proportions, it is the usual practice to do so in ventures of this kind. After the stock dividend was declared each beneficial owner of bonds owned 125 shares of stock for each $1,000 bond.

There was no impediment or restriction on the resale, by clients of Benson Limited and Fleming Limited, of the securities of petitioner acquired by them.

The $400,000 received by petitioner for the issue of its "5% 1st Mortgage Bonds" was paid by Benson Limited and Fleming Limited from their own funds. They took the original risk, and, with the exception of amounts retained by these two firms and by their members, sold the remainder to their English and Scottish investment-trust clients. Neither the petitioner, nor its controlling stockholders, the Ohrstrom Group, had any control over the resale of petitioner's securities by Benson Limited and Fleming Limited.

The bonds of petitioner were issued as of May 10, 1949, and were in the conventional form of a mortgage bond indebtedness, with a sinking fund provision. They had a fixed due date, and were payable on December 1, 1956. They provided for the payment of interest semiannually, at the rate of 5 per cent per annum, on the unpaid balance of principal on the first day of June and December of each year, with the first payment due December 1, 1949; for acceleration of the maturity date in the event that the payment of interest was in default for a specified period, or if the petitioner became bankrupt, or insolvent, or went into voluntary or involuntary liquidation; and for the setting up of a sinking fund reserve, semiannually on or before June 1 and December 1 of each year, commencing June 1, 1950, for the purchase, redemption or partial payment of the bonds, in an amount equal

to 80 per cent of its net earnings for the prior 6 months' fiscal period ending February 28 and August 31, respectively. The sinking fund reserve was to be applied as soon as practical on or after June 1, 1950, and on or after each June 1 and December 1 thereafter, to the purchase, redemption or partial payment of the bonds. No other use could be made of the sinking fund reserve.

The bonds were in registered form. They were redeemable from time to time, at the option of petitioner, upon notice. They required that payment of the principal and interest be secured by a first mortgage or deed of trust on all of the real property, and the buildings and improvements thereon, then owned by the company, or which the company thereafter acquired, subject to any existing mortgage or deed of trust on property then owned, and subject to any purchase money mortgage or deed of trust on after-acquired property. In the event of voluntary or involuntary dissolution or liquidation, or in the event of insolvency, neither the principal of the bonds, nor unpaid interest, could be paid "from the general assets of the Company" until all obligations of the company representing money borrowed from banks or trust companies on short-term maturities not exceeding 18 months, in an amount not exceeding $150,000 in the aggregate, were paid; however, rights under the mortgage were to remain unaffected by the foregoing priority with respect to the general assets.

The deed of trust securing the petitioner's 5 per cent first mortgage bonds was executed on October 24, 1949, and was filed of record on November 3, 1949, in the office of the county recorder of Los Angeles County, California. The delay in executing the document was attributable principally to difficulties encountered in selecting trustees.

The deed was executed by the petitioner as trustor, naming as trustees three individuals and their respective successors, for the benefit of the registered holders of each and every bond as beneficiaries. It authorized the trustor, together with beneficiaries holding not less than a majority in face amount of the bonds then outstanding, to substitute, from time to time, a successor to any trustee. It granted to the trustees, in trust and "with power of sale," the real estate of petitioner, together with all buildings and improvements thereon, for the purpose of securing all of the petitioner's obligations under its bonds. It provided that, in the event of any default by the trustor, the trustees may, on their own volition, and shall, on the written request of the beneficiaries holding not less than a majority in face amount of the bonds then outstanding, declare all sums secured by it to be immediately due and payable, by delivering written notice to trustor, together with demand for sale or notice of election to cause the property to be sold. It specified the procedure for sale at public auction under the trustees' power of sale, with the application of the proceeds to the payment, with interest, of sums expended by

the trustees, the payment of all other sums secured by the deed, and the payment of the remainder, if any, to the person or persons legally entitled thereto.

One of the three trustees was Vernon Lynn, who was president and a director of petitioner from April 25, 1949, to May 9, 1949, and held a power of attorney from G. L. Ohrstrom & Co. He and the other two trustees were members of a New York law firm which had been counsel for Ohrstrom in many matters, including the setting up of companies.

If the petitioner had defaulted on its bonds, the investment trusts and the Bank of England would have insisted upon the enforcement of the security obligations; and Benson Limited and Fleming Limited considered they had a fiduciary responsibility to protect the interests of the investment trusts.

Except as modified with the written consent of the bondholders, the requirements of the sinking fund provisions of the bonds were observed by the petitioner. Bonds in the principal amount of $40,000 were redeemed on July 31, 1950, and $8,000 in bonds were redeemed on December 19, 1950, leaving bonds outstanding in the principal amount of $352,000. The sinking fund reserve as of February 28, 1951, was $112,637.23. Prior to June 1, 1951, the petitioner obtained the written consents of the bondholders to defer the application of the mandatory redemption features of the sinking fund for a period not beyond June of 1952, and to use the reserve, to the extent required, as additional working capital then needed to handle increased business incident to the National Defense program. On its accounting records the petitioner showed, as "Restricted" surplus reserved for the retirement of its bonds, the following amounts of sinking fund reserves:

| | |
|---|---|
| Year ended Feb. 28, 1951 | $112, 637. 23 |
| Year ended Feb. 29, 1952 | 352, 000. 00 |

In March of 1951, the petitioner sought to establish a line of credit with the Bank of America; but negotiations were terminated because the bank insisted on a condition that the sinking fund provisions be subordinated to the proposed line of credit, and petitioner felt the bondholders would not consent to this.

On January 7, 1952, petitioner increased its authorized capital stock to 109,200 shares, of which 105,000 shares, with a par value of $2 a share, was common stock, and 4,200 shares without par value, was $5 cumulative preferred stock.

In February of 1952, the directors of petitioner discussed the matter of refinancing the 5 per cent first mortgage bonds outstanding, in view of the fact that under the sinking fund provisions the $352,000 balance of the bonds was due for redemption in June of 1952. The officers of petitioner were authorized by the directors to negotiate and enter into a loan agreement with Atlantic Life Insurance Company to

borrow $300,000 to apply in redemption of the outstanding bonds at the earliest practicable date.

The Atlantic Life Insurance Company refused to make the $300,000 loan unless it was given the right to purchase 16,800 shares of petitioner's common stock at 10 cents a share.

On March 4, 1952, the petitioner purchased as treasury stock all of the stock held by the British investment trusts. Benson Limited and Fleming Limited did not sell their own shares. The shares purchased (42,250 shares of common stock) were bought at a price of $8 a share, payable in terms of $4 a share in cash and $4 a share in promissory notes (due on or before August 31, 1955) which were to be convertible later into any preferred stock petitioner might issue.

Out of the 42,250 shares of common stock purchased by petitioner on March 4, 1952, it distributed 25,450 shares on March 7, 1952, as a stock dividend on its then outstanding common stock. On the same date petitioner distributed as a stock dividend to its common stockholders 2,510 shares of its $5 cumulative preferred stock. The preferred stock was assigned a stated value of $100 a share, and $251,000 was transferred from surplus to capital account upon the issuance of the preferred shares.

On March 10, 1952, petitioner granted the Atlantic Life Insurance Company the right to purchase up to 16,800 shares of petitioner's common stock, then held in its treasury, at 10 cents per share at any time on or before April 30, 1952.

On March 10, 1952, petitioner borrowed $300,000 from Atlantic Life Insurance Company of Richmond, Virginia, on its unsecured promissory note, due on or before August 31, 1959, bearing interest on the amount of unpaid principal at the rate of 5 per cent per year, payable semiannually on the last days of February and August in each year, commencing August 31, 1952. Under a concurrent loan agreement, the petitioner was obligated to use the borrowed funds together with other funds to retire all of its 5 per cent first mortgage bonds.

On March 10, 1952, the petitioner redeemed the remaining balance, $352,000, of its 5 per cent first mortgage bonds with the $300,000 borrowed from Atlantic Life Insurance Company, and $52,000 of its own funds.

On March 24, 1952, the Atlantic Life Insurance Company exercised its option to purchase 16,800 shares of petitioner's common stock for 10 cents per share.

On April 1, 1952, petitioner issued 1,690 shares of its $5 cumulative preferred stock, at an assigned value of $100 a share, in exchange for the promissory notes (in the total amount of $169,000) then held by the British investment trusts.

The decision to issue preferrred stock to the British investment trusts arose out of events incident to the borrowing of funds from Atlantic Life Insurance Company in 1952, and there was no plan, at the inception of the corporate life of petitioner, to issue preferred stock to the British interests.

During the years here involved:

(a) Residents of the United Kingdom not engaged in trade or business in the United States were exempt from United States tax on gains from the sale or exchange of capital assets;

(b) Interest on bonds, securities, notes, debentures, etc., derived from sources within the United States by a resident of the United Kingdom, who is subject to United Kingdom tax on such interest and not engaged in trade or business in the United States, was exempt from United States tax;

(c) None of the above kinds of income received by a resident of the United Kingdom was subject to withholding at the source in the United States.

On June 17, 1949, the board of directors of petitioner authorized the payment to George L. Ohrstrom of compensation in the amount of $38,000 (9½ per cent of $400,000) for his services in negotiating and securing financing of $400,000 represented by the first mortgage bonds. Fees of $169.45 were also paid to the Corporation Trust Company in connection with the issuance of the bonds.

On its returns for the taxable years the petitioner claimed the following deductions:

| Year | Amortization of financing fees (Total $38,169.45) | Interest |
|---|---|---|
| Period Apr. 22, 1949 to Feb. 28, 1950 | $4,147.65 | $16,168.00 |
| Year ended Feb. 28, 1951 | 8,463.96 | 18,833.19 |
| Year ended Feb. 29, 1952 | 4,381.32 | 17,599.92 |

In determining the deficiencies, the respondent disallowed the deduction of all of the amounts claimed for interest, and all of the amounts claimed for amortization of financing fees, with the exception of $169.45.

The issuance of petitioner's 5 per cent first mortgage bonds in the face amount of $400,000 resulted in the creation of a bona fide indebtedness between petitioner and the bondholders.

### OPINION.

RAUM, *Judge:* 1. Benson Limited and Fleming Limited, two English banking houses, joined in 1949 with G. L. Ohrstrom & Co., an American firm which specialized in acquiring industrial companies, in a venture which contemplated the purchase of the stock of a California corporation by a new Delaware corporation, the petitioner, and the acquisition by the latter of the business and assets of the California

corporation. In order to get the venture under way, petitioner was incorporated under the laws of Delaware with a capital stock of 1,000 shares having a par value of $1 per share (the minimum permitted by the laws of Delaware (8 Del. C., sec. 102 (4)) ; the English banking houses advanced as loans the amount of $400,000, and acquired 500 shares of its stock for $1 per share; and the Ohrstrom group purchased 550 shares of its stock (500 of the initial issue and 50 of a subsequent issue) for $1 per share. Thereafter a stock dividend increased the outstanding stock to 105,000 shares, but the Ohrstrom group and the English shareholders continued to own the stock in the same proportions, namely, 52.38 per cent and 47.62 per cent, respectively. The $400,000 advance was evidenced by 5 per cent first mortgage bonds bearing a 1956 maturity date. The two banking houses, in turn, sold most of the bonds and shares of stock to institutional investors in Great Britain. The principal issue is whether petitioner may deduct interest upon the bonds, and the answer depends upon whether the bonds represented a bona fide indebtedness, as contended by petitioner, or whether they were in truth and in substance merely equity capital.

The problem is a familiar one, and there is no magic formula that provides the solution. The facts of each case must be studied, and the comparative emphasis or weight that is to be accorded to the various factors usually examined in this connection depends upon the facts as a whole. After a complete review of all of the facts we have reached the conclusion that the bonds, in substance as well as in form, constituted a bona fide indebtedness.

The bonds bore an early maturity date, December 31, 1956, and were subject to redemption even prior thereto through the operation of a mandatory sinking fund. Indeed, the entire issue was in fact redeemed within 2 years and 10 months, after two intermediate redemptions totaling $48,000 in face value of bonds. The bondholders had no rights under the bonds or deed of trust to participate in or to control the management of petitioner. While it is true that the mortgage security was not fully adequate, the bondholders had further protection through the medium of the sinking fund. We do not deem this aspect of the case fatal to petitioner's position. Taking into account the entire history of the transaction we are satisfied that the bonds were not a sham and that they represented a true indebtedness.

The respondent points to certain facts in support of his contention that the bonds were really equity capital and not bona fide loans. Thus, he stresses the delay in the formal execution of the deed of trust, the priority accorded the temporary closing loan from the Bank of America, and the waiving of the sinking fund requirement. However,

when these are examined carefully, it will be seen that they are not inconsistent with the existence of a bona fide debt.

The delay in execution of the deed of trust was satisfactorily explained as having been occasioned by difficulties in the selection of trustees. It was originally intended that a corporate trustee, the Bank of America, would serve as a cotrustee, but the bank desired limitations on the responsibilities of the trustees which were not acceptable to the parties, and time-consuming steps were then taken to obtain the approval of the bondholders to the appointment of three individual cotrustees recommended by G. L. Ohrstrom & Co. We fail to see how this delay in executing the deed constituted a significant failure to observe the security provisions of the bonds. Moreover, the bonds, issued on May 10, 1949, provided that they "shall be secured by a first mortgage or deed of trust on all the real property, and all buildings and improvements thereon, now owned or which may be acquired by the Company at any time hereafter." And it seems probable that under California law this agreement itself was sufficient to create an equitable lien which would be enforceable by judicial foreclosure. Cf. *Higgins* v. *Manson*, 126 Cal. 467, 58 P. 907; *Beckwith* v. *Sheldon*, 168 Cal. 742, 145 P. 97. See also *Haas* v. *Rendleman*, 62 F. 2d 701, 702 (C. A. 4).

On May 6, 1949, petitioner borrowed $170,000 from the Bank of America as a "temporary closing loan" for a 10- to 12-day period. Petitioner gave the bank assurance that no pledge or security of any of its assets would be issued or granted in connection with the bond issue of $400,000 until the $170,000 loan had been paid. The bonds were issued on May 10, 1949, and the bank loan was paid on May 12, 1949. There was, therefore, a temporary overlapping of these loans for a 2-day period. The evidence convinces us that it was not contemplated that the $400,000 loan would be subordinated to the bank loan for any appreciable time, and that the limited priority accorded this temporary closing loan did not constitute a material failure to observe the security provisions of the bonds.

As of February 28, 1951, the sinking fund reserve was $112,637.23, and unredeemed bonds in the amount of $352,000 were outstanding. Prior to June 1, 1951, petitioner obtained the written consents of its bondholders to defer the application of the mandatory redemption features of the sinking fund for a period not beyond June of 1952, and to use the reserve, to the extent required, as additional working capital then needed to handle increased business incident to the national defense program. We are unable to see how this constituted a failure on the part of petitioner to observe the provision of the bonds relating to the reserve. On the contrary, it indicates that the petitioner recognized the binding character of the sinking fund pro-

visions and sought and received the consent of the bondholders when it wished to be released from applying them for a short period. The receipt of this consent did not in any way affect the obligation of petitioner to retire the bonds on or before December 1, 1956, and on March 10, 1952, it retired all of the bonds then outstanding.

The respondent further contends that the proportionate holdings of bonds and stock strongly indicate that the $400,000 advanced by the English banking houses was, and was intended to be, in the nature of capital investment. We do not agree. The stockholders of petitioner did not hold its bonds in uniform proportion to stock. The Ohrstrom Group, which held 52.38 per cent of its stock, owned no bonds, and the British Group, which owned all of the bonds, held 47.62 per cent of its stock. Moreover, prior to February 21, 1950, the respective stock and bond holdings within the British Group were not in direct proportion. Approximately 9 months after the bonds and stock were issued, after one "street name" in the British Group had made stock transfers to three other "street names" in the group and after a stock dividend had been declared by petitioner, the holdings *within* the British Group fell into direct proportions. This appears to have resulted from negotiations between Benson Limited and Fleming Limited and their clients in connection with the resale of the bonds, and not from any requirement by petitioner or the Ohrstrom Group that the stock and bond holdings be proportionate within the British Group. The opportunity to purchase stock for a nominal amount was one of the important factors which induced the two English banking houses to purchase the bonds. The issuance of stock to subscribers to corporate bonds as an inducement to purchase bonds is not without precedent,[2] and we are satisfied from the evidence that when the English banking houses agreed to purchase the bonds, they intended to offer a proportionate amount of this stock to their investment-trust clients as an inducement to them to purchase bonds. The execution of this intention resulted in the apparent proportionate holdings of bonds and stock on and after February 21, 1950, within the British Group.

The Government's most insistent contention revolves around the high debt-to-equity ratio, sometimes referred to as "thin incorporation." There is no doubt that a disproportionately high debt structure is a suspicious circumstance, and calls for inquiry into whether the indebtedness is really what it appears to be. Cf. *Isidor Dobkin*, 15 T. C. 31, 33, affirmed 192 F. 2d 392 (C. A. 2). But there is no rule of thumb that automatically classifies a debt as a sham merely because of a high debt-to-equity ratio. One must still look to see whether the so-called creditors placed their investment at the risk of the business, or whether there was an intention that the alleged loans be repaid in any

---

[2] See Fletcher, Cyc. Corp., permanent ed., Vol. 6A, sec. 2680.

event regardless of the fortunes of the enterprise. Cf. *Root* v. *Commissioner*, 220 F. 2d 240, 241 (C. A. 9). And although this may be a close case in view of the high debt-to-equity ratio, we are satisfied that the intention here was to create a debt. The bonds had a comparatively early maturity date and were in fact paid off even prior thereto. The history of the venture, particularly the requirements of the Bank of England, point to an intention to establish a debtor-creditor relationship. The sharply disproportionate ratio between ownership of stock and bonds goes far to overcome the high debt-to-equity ratio here. The bondholders owned only some 48 per cent of the stock. The situation would have been quite different had all the stock and bonds been owned by the same interests in substantially the same proportion. This is not to say that such proportionate ownership is indispensable to the Government's position, for it is not (cf. *Colony, Inc.*, 26 T. C. 30, 43, affirmed on another issue 244 F. 2d 74 (C. A. 6) ) ; but where the disproportion is so substantial and where the parties are so completely unrelated as the Ohrstrom Group and the clients of the English banking houses, such disproportion tends strongly to neutralize the inferences that might otherwise be drawn from the high debt-to-equity ratio.

The Government has made a variety of other contentions, some of them based upon alleged attempts at tax avoidance, both under American and British law. We have considered them all, but we are still of the opinion that the bonds herein were nevertheless a bona fide indebtedness and that the interest thereon is properly deductible.

2. The remaining question relates to deductions taken by petitioner for amortization of financing fees. The respondent contends that since the bonds were in substance shares of equity capital, the entire amount of the fees and expenses incident to obtaining the bonds represents part of peitioner's invested capital, and, as such, is not deductible. In the alternative, he contends that the payment to Ohrstrom of $38,000 was in return for his services in organizing petitioner, and, therefore, constituted a nondeductible capital expenditure.

Inasmuch as we have held that the bonds constituted a genuine indebtedness, the respondent's principal contention must fail. Nor can his alternative contention stand. There is no evidence that the financing fees incurred by petitioner represented an organizational expense. The parties have stipulated that they were incurred for "services in negotiating the bond financing." Expenses of this character may be amortized over the life of the bonds and deducted as amortized from gross income. Cf. *Helvering* v. *Union Pacific Co.*, 293 U.S. 282, 284; G. C. M. 14349, XIV-1 C. B. 47. The respondent erred in disallowing the amortization deductions claimed by petitioner for each of the taxable years.

*Decision will be entered under Rule 50.*