Rudolph Investment Corporation[1] v. Commissioner. Rudolph Inv. Corp. v. Commissioner
Docket Nos: 4798-70, 4799-70, 4800-70.
United States Tax Court
T.C. Memo 1972-129; 1972 Tax Ct. Memo LEXIS 130; 31 T.C.M. (CCH) 573; T.C.M. (RIA) 72129; June 12, 1972
David R. Frazer and John C. King, for the petitioners. Dennis C. DeBerry, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated cases the respondent determined the following Federal income tax deficiencies: Year
Petitioner
Dkt. No.
Ended
Deficiency
Rudolph Investment Corporation
4798-70
12-31-66
$18,962.59
12-31-67
19,240.20
12-31-68
6,344.82
Rudolph Finance Company
4799-70
8-31-68
4,475.16
Rudolph Chevrolet Inc.
4800-70
12-31-68
40,254.35
The issues presented for decision are: 1. Were certain advances made by Rudolph Finance Company to Bill Day Auto Parts, Inc., bona fide loans or contributions to capital? 2. If the *131 advances were contributions to capital, did Rudolph Investment Corporation receive a constructive dividend from Rudolph Finance Company because of the advances made by Rudolph Finance Company to Bill Day Auto Parts, Inc.? 3. Did respondent propertly reallocate the purchase price paid by Rudolph Chevrolet, Inc., for the Yolo Ranch between depreciable and nondepreciable assets? 4. Are earthen tanks and dams depreciable assets? 5. What was the correct salvage value for the cows in the breeding herd on the Yolo Ranch? 6. Did respondent correctly allocate the basis for the cows in the Yolo Ranch preeding herd $&574 7. Was respondent correct in disallowing depreciation for yearling heifers? 8. Are roads and trails on the Yolo Ranch subject to an allowance for depreciation? 9. Was respondent correct in disallowing depreciation for the fencing on the national forest permit land? Findings of Fact Some of the facts have been stipulated by the parties. The stipulation of facts and supplemental stipulation, together with the exhibits attached thereto, are incorporated herein by this reference. General Rudolph Investment Corporation is a corporation organized in February *132 1962, under the laws of the State of Arizona, with its principal office located in Phoenix, Arizona. It filed Federal income tax returns (Form 1120) on an accrual method of accounting for calendar years ending 1966, 1967 and 1968, with the district director of internal revenue, Phoenix, Arizona. Rudolph Finance Company is a corporation which was organized in Arizona in August 1959 with its principal office located in Phoenix. It filed a Federal income tax return (Form 1120) in the accrual basis of accounting for the fiscal year ending August 31, 1968, with the district director of internal revenue at Phoenix. Rudolph Chevrolet, Inc., is a corporation which was organized in August 1959, under the laws of the State of Arizona, with its principal office located in Phoenix. It filed a Federal income tax return (Form 1120) on an accrual basis of accounting for the calendar year 1968, with the district director of internal revenue at Phoenix. During the years here involved, Rudolph Finance Company was a wholly-owned subsidiary of Rudolph Investment Corporation. During the years here involved, Rudolph Investment Corporation owned 75 percent of the common stock of Rudolph Chevrolet, *133 Inc., and Lou Grubb owned the remaining 25 percent of the common stock. Bill Day Auto Parts, Inc., was formed from a then existing corporation formerly called Rudolph Auto Lease, Inc., with 75 percent of its stock owned by Rudolph Investment Corporation and 25 percent owned by William F. Day, Jr. Rudolph Investment Corporation is a personal holding company that also owned controlling interests in other corporations located in Phoenix, Arizona; El Paso, Texas; and San Diego, California. Advances to Bill Day Auto Parts, Inc. Bill Day Auto Parts, Inc., had 1,333 1/ shares of common stock issued at a $1 per share par value of $1,333.333 in capital. When Bill Day Auto Parts, Inc., started business on March 19, 1963, it procured from Southern Arizona Bank during a period from February through July 1963, on an open loan account, $72,500, primarily used in the purchase of inventory. Bill Day Auto Parts, Inc., gave no security for this loan but Rudolph Chevrolet, Inc., guaranteed the loans made to Bill Day Auto Parts, Inc. Rudolph Finance Company did not participate in the management of Bill Day Auto Parts, Inc. In August 1963, Rudolph Finance Company advanced $15,000 to Bill *134 Day Auto Parts, Inc. These funds were applied against the Southern Arizona Bank loan. The Southern Arizona Bank loan and the Rudolph Finance Company advances were shown on the books and records of Bill Day Auto Parts, Inc., as "Notes Payable - So. Arizona Bank and Rudolph Finance Co." During the entire existence of Bill Day Auto Parts, Inc., Bill Day was its president as well as the person who managed and operated it. He had a very good reputation in the automobile parts business, as well as a reputation for integrity and geting things done. The officers of Bill Day Auto Parts, Inc., intended to repay the loans made to it from the Southern Arizona Bank. From the inception of the corporation through its fiscal year ended March 31, 1967, the assets of Bill Day Auto Parts, Inc., exceeded the notes payable to Rudolph Finance Company. The current assets and notes payable at the end of the fiscal years 1964 through 1969 were as follows: Fiscal Year
Current Assets
Notes Payable
1964
$ 85,211.26
$ 70,500.00
1965
94,194.39
66,500.00
1966
98,876.58
66,610.42
1967
128,310.62
89,529.52
1968
86,649.32
111,529.52 575 Rudolph Finance Company expected *135 the amounts advanced to Bill Day Auto Parts, Inc., to be repaid because there were enough accounts receivable, inventory and fixed assets of equipment to cover the advances. Rudolph Finance Company received the following notes from Bill Day Auto Parts, Inc.: Interest
Date
Amount
Term
Rate
Aug. 16, 1963
$ 15,000.00
1 Year
5%
Oct. 27, 1966
85,110.42
Demand
6 1/2%
Mar. 31, 1967
89,529.52
Demand
6%
Mar. 21, 1968
111,529.52
Demand
6%
None of the notes from Bill Day Auto Parts to Rudolph Finance were subordinated to any of the creditors of Bill Day Auto Parts, Inc. None of the notes from Bill Day Auto Parts to Rudolph Finance Company had any preference over any creditors of Bill Day Auto Parts, Inc. None of the notes from Bill Day Auto Parts to Rudolph Finance Company were convertible into stock of Bill Day Auto Parts, Inc. The interest on the advances from Rudolph Finance to Bill Day Auto Parts was accrued on the books of Bill Day Auto Parts on a monthly basis. The interest was paid on a monthly basis from the inception of the advances until the latter part of 1967. Rudolph Finance Company first realized that its advances were not *136 secured by the assets of Bill Day Auto Parts, Inc., after it received the financial report for March 31, 1968, which showed a sizeable loss and also a shortage of inventory. Rudolph Finance Company then followed up with phone calls, as it did with any other delinquent account. Based upon the inventory shortages, Rudolph Investment determined that it would sell the assets of Bill Day Auto Parts, Inc., in order to limit its loss. The assets of Bill Day Auto Parts were sold to Bill Day for $20,000, after which Bill Day Auto Parts, Inc., was liquidated. The $20,000 sales price was the best offer received by Bill Day Auto Parts, Inc. At the time of the liquidation of Bill Day Auto Parts, the loans to Bill Day Auto Parts, Inc., became worthless in the amount of $98,393.70. All advances from Rudolph Finance Company to Bill Day Auto Parts, Inc., were bona fide loans and not contributions to capital. Yolo Ranch In the spring of 1968, Bill Waddoups, president of Rudolph Chevrolet, Inc., began negotiating for the purchase of the Yolo Ranch. Throughout the negotiations Waddoups relied upon the advice of Bryce Miller, an accredited rural appraiser, who concluded at the time of the purchase *137 that the price was a fair one. Miller made an appraisal of the land on the ranch. This appraisal was used to determine the value of the improvements on the land by subtracting the land appraisal from the total purchase price. The purchase price for the land and improvements under the contract of sale dated July 1, 1968, was $1,016,000. The total purchase price for the cattle on the ranch was $478,000. In the final sales agreement $712,000 was allocated to the improvements. The purchase price for the land included deeded land of 11,957 acres, State lease land of 76,270 acres, Bureau of Land Management land (Taylor Grazing) of 3,470 acres and Forest Service land of 18,300 acres. Both the Bureau of Land Management land and National Forest permit land are leased from the Federal Government on a ten year renewable lease, both of which are automatically renewable unless there is a serious misuse or mismanagement of the Federal land. Spread throughout the entire ranch on all the various types of land, both deeded and leased, are residences, barns, corrals, chutes, fences, pastures and houses. Some of the improvements located on the deeded land are used for the cattle that graze *138 on the State lease land. Each cow purchased by Rudolph Chevrolet, Inc., was jointly valued by appraisers at $227.50 per head. There are approximately 153 miles of fencing on the Yolo Ranch. The useful life of these fences in June 1968 was ten years. All of the roads and the trails on the Yolo Ranch lead either to or from various improvements on the ranch. The roads and trails were improved to varying degrees, including gates, cattle guards, drainange drainage ditches and in some cases they were terraced to prevent washout. The purchase price of the Yolo Ranch included 100 percent of the value of the 576 outside boundary fences on the State lease land. There has been no agreement between Rudolph Chevrolet, Inc., and any of the surrounding neighbors indicating an ownership interest by the neighbors in the boundary fences. The improvements on the United States Forest Service land were included in the purchase price of the Yolo Ranch and were owned by Rudolph Chevrolet, Inc. All of the boundary fences on the Yolo Ranch, except for 18 miles of Forest Service boundary fences, are completely maintained by Rudolph Chevrolet, Inc. The cows on the Yolo Ranch herd become breeders *139 as yearlings. On June 29, 1968, the deeded land of the Yolo Ranch had a fair market value of $179,355 (or $15 per acre). The Arizona State grazing lease land (without improvements) had a fair market value of $141,100 (or $1.85 per acre). The BLM Taylor grazing land (without improvements) had a fair market value of $4,065 (or $1.173 per acre). The national forest permits had a value of $75,000. The improvements on the Yolo Ranch had a fair market value of $572,300. The fair market value of the improvements on the State lease land was $218,087. The highest and best use for the Yolo Ranch at the time it was purchased was as a cattle ranch. On the date the Yolo Ranch was purchased the fair market values of the cows purchased were as follows: Age of Cow
Fair Market Value
2 year old
$200.00
3 year old
300.00
4 year old
325.00
5 year old
325.00
6 year old
300.00
7 year old
300.00
8 year old
250.00
9 year old
200.00
10 year old
175.00
The salvage value of a bull is considerably higher than the salvage value of a cow. The salvage value of the bulls in the breeding herd in 1968 was $75 per bull. The salvage value of the cattle purchased by Rudolph *140 Chevrolet, Inc., as part of the purchase of the Yolo Ranch in 1968 was $56.50 per cow. There were several earthen tanks on the Yolo Ranch when it was purchased by Rudolph Chevrolet, Inc. Such tanks and dams, as the result of erosion processes, were filled over a period of approximately ten years, so that at the end of the ten-year period they ceased to have any ranch value. The improvements, such as gates, culverts, drainage ditches and terraces, on the roads and trails of the Yolo Ranch have a useful life of ten years. The holders of Federal BLM grazing lease and the Forest Service grazing permits involved herein, as well as the State of Arizona grazing leases, are granted preference rights of renewal. While the leases and permits were limited on their faces to definite terms without expressed absolute right of renewal for additional terms, there was in fact reasonable certainty of continued renewal during an undetermined period in the future. Such leases and permits are customarily renewed at the end of the period and the life thereof is therefore not limited to the term of the current lease or permit. The rights once acquired under such leases and permits are subject to some *141 adjustment if it should become necessary for protection of the range. However, such rights are not limited as to time, are basically of indefinite duration and continue until cancelled or revoked. The grounds for cancellation or revocation are wholly contingent and may never happen, and some are wholly within the control of the preference holder. Opinion 1. Advances to Bill Day Auto Parts, Inc. For the taxable year ended August 31, 1968, Rudolph Finance Company claimed a bad debt deduction in the amount of $98,393.70, which resulted from "loans" to Bill Day Auto Parts, Inc. Respondent determined that the "loans" were not bona fide, but were contributions to capital, and therefore disallowed the claimed bad debt deduction. Respondent also determined that the advances made by Rudolph Finance to Bill Day were constructive dividends to Rudolph Investment Corporation, which then made a contribution of such amounts to the capital of Bill Day. Rudolph Finance Company contends that all the advances to Bill Day constituted bona fide loans. To the contrary, respondent argues that the advances were in reality dividends to the parent, Rudolph Investment, and capital contributions therefrom *142 to Bill Day. The determination of debt or equity is basically a question of fact. A. R. Lantz Co. 577 v. United States, 424 F. 2d 1330, 1334 (C.A. 9, 1970). Several factors, which to varying degrees influence the resolution of this issue, are enumerated in O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123, 125-126 (C.A. 9, 1960), as follows: They are (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions. Here all four certificates of indebtedness are in the normal form of notes. The first note had a maturity date of *143 one year, and the other three were demand notes. The sources of the payments on the notes are not known. Rudolph Finance had the legal right to enforce the payment of principal and interest on the notes, and there was no condition attached to the repayment thereof. Rudolph Finance did not participate in the management of Bill Day. None of the notes were subordinated to or had preference over any creditors of Bill Day. The intent of all the parties concerned was to treat the notes as bona fide indebtedness and all parties expected the loans to be repaid. Rudolph Finance expected to be repaid because there were enough accounts receivable, inventory and fixed assets to cover the loans, at least until 1968. Although Bill Day Auto Parts may have been inadequately capitalized initially ($1,333 in cash and a loan of $72,500), the original loan was made by the Southern Arizona Bank and not by any of the Rudolph corporations. Furthermore, "thin" capitalization is only one of the factors to be taken into consideration and is not by itself decisive. See and compare American Processing and Sales Company v. United States, 371 F. 2d 842 (Ct. Cls., 1967); Affiliated Research, Inc. v. United States, 351 F. 2d 646 *144 (Ct. Cls., 1965); Byerlite Corporation v. Williams, 286 F. 2d 285 (C.A. 6, 1960); Baker Commodities, Inc., 48 T.C. 374 (1967), affd. 415 F. 2d 519 (C.A. 9, 1969); and Leach Corporation, 30 T.C. 563 (1958). Since neither Bill Day nor Rudolph Investment loaned any money to Bill Day Auto Parts, Inc., there is no correlation between the stock ownership and the "loans" to the corporations. Bill Day Auto Parts, Inc., was never in a position to declare a dividend; hence, the payment of interest was not made out of "dividend" money. Finally, Bill Day Auto Parts, Inc., was able to obtain outside loans as evidenced by the original loan from the Southern Arizona Bank. We are indeed confronted with a close question. While our conclusion may not be entirely free from doubt, we think the evidence with respect to the various factors preponderates in favor of the petitioner. Therefore, we hold that the advances to Bill Day Auto Parts, Inc., were bona fide loans and that Rudolph Finance is entitled to the bad debt deduction it claimed. [2]
*145 2. Allocation of purchase price of the Yolo Ranch between depreciable and nondepreciable assets. In its Federal tax return for the year 1968 Rudolph Chevrolet, Inc., allocated the purchase price of the Yolo Ranch to certain depreciable and nondepreciable items. Respondent reallocated the purchase price by increasing the value of the nondepreciables, particularly State grazing lease land which comprised about 90 percent of the ranch, and reducing the value of the depreciable items. Both parties presented expert testimony and appraisal reports. In most respects we accept the appraisal report of petitioner's expert witness. The major point of difference is the valuation of the State lease land. On its tax return Rudolph Chevrolet valued the State lease land without improvements at $1.56 per acre. In his notice of deficiency respondent valued the State lease land without improvements at $4 per acre. At the trial respondent's expert witness expressed his opinion that the State lease land without improvements was $5.80 per acre. It is our conclusion, as shown in our findings of fact that the value of the State lease land without improvements was $1.85 per acre. While we might marshal *146 and discuss at length the substantial evidence 578 presented by the experts on both sides, we think such an effort would be without purpose. Extended discussions of factual materials, pro and con, terminating in a conclusion that is based in the last analysis upon a subjective judgment about the weight of all the evidence considered, often gives merely the illusion of a process of reasoning, when in fact the result reached is simply the trial judge's ultimate finding of fact on the record as a whole. See Morris M. Messing, 48 T.C. 502, 512 (1969); Colonial Fabrices v. Commissioner, 202 F. 2d 105 (C.A. 2, 1953), affirming a Memorandum Opinion of this Court. 3. Earthen water tanks and dams. In his notice of deficiency the respondent determined that "the earthen tanks and dams have interminable useful lives that are not reasonably susceptible of measurement and are, therefore, not depreciable." Petitioner offered the testimony and opinion of an accredited appraiser and ranching expert that the earthen tanks and dams on the Yolo Ranch have a useful life of ten years. See Fancher v. United States (D.C.S.D. 1962); Ekberg v. United States, (D.C.S.D. 1959). *147 Accordingly, we hold for the petitioner on this issue. 4. Salvage value of cows in breeding herd. Petitioner Rudolph Chevrolet, Inc., has conceded that its claimed 10 percent salvage value for the purchased bulls and cows in the breeding herd was incorrect. It has been stipulated that the savage value of a bull in the breeding herd is $75, which is the amount determined by respondent. The salvage value of a cow in the breeding herd was also determined by respondent to be $75. However, the testimony of both expert witnesses was that the salvage value of a cow is less than the salvage value of a bull. On this record we hold that the salvage value of a cow in the Yolo Ranch breeding herd was $56.50. 5. Allocation of cost basis for cows in breeding herd. In its Federal income tax return for the year 1968 Rudolph Chevrolet, Inc., allocated $227.50 as the basis of each of the cows it purchased for depreciation purposes. Although this price was apparently based on the price per cow as stated in the contract of sale, Rudolph Chevrolet has conceded that the claimed cost for the cows was not correct and now agrees that the basis for the cows should be allocated according to age. The fair *148 market values for the purchased cows are set out in our findings of fact. These values are based on the testimony of petitioner's expert witness. 6. Depreciation for heifers. Respondent determined that yearling heifers could not be depreciated because they were not considered breeders. The evidence is to the contrary since both Mr. Waddoups and petitioner's expert witness testified that cows on the Yolo Ranch became a part of the breeding herd when they were yearlings. Consequently, we hold for the petitioner on this issue. 7. Depreciation on roads - grading and improvements. Respondent determined that depreciation of $1,600.22 claimed by Rudolph Chevrolet, Inc., on the roads and trails of the Yolo Ranch was not allowable because they were not associated with any buildings but only with the land. Rev. Rul. 68-193, 1968-1 C.B. 79, provides that the grading of roads is not depreciable unless the roads would be abandoned or replaced contemporaneously with buildings with which the roads were directly associated. The testimony of Mr. Waddoups was that all of the roads and trails on the Yolo Ranch led to improvements. Thus it appears that the roads would be abandoned *149 if the improvements were no longer needed. The depreciation of the roads included not only the cost of grading but also improvements, such as gates, cattle guards, drainage ditches and terraces to prevent washout. The evidence shows that the expenses incurred for these road improvements are depreciable since they are not expenditures related to an improvement or physical development added to the land any more than buildings are improvements that add to physical development of land. See Rev. Rul. 65-265, 1965-2 C.B. 52. We hold for the petitioner on this issue. 8. Depreciation for fencing on national forest permit land. Respondent determined that the fences on lands leased from the United States Forest Service were not depreciable by Rudolph Chevrolet, Inc., because it only leased the land and title to the fences vested in the United States at the time they were made. In our opinion the petitioner is entitled to depreciate the fences even though title belongs to the United States Forest Service. See D. Loveman & Son Export Corporation, 34 T.C. 776, 807 (1960), affd, 296 F. 2d 732 (C.A. 6, 1961); and 579 compare section 1.167(a)-4, Income Tax Regs. *150 ; and Catherine B. Currier, 51 T.C. 488, 492 (1968), where a lessee who makes capital improvements on the leased property is entitled to depreciation on the improvements. But since 18 miles of Forest Service boundary are cooperatively maintained by Rudolph Chevrolet and its neighbors, the petitioner may depreciate only one-half of the 18 miles of such fencing. To reflect various concessions and our conclusions on the disputed issues, Decisions will be entered under Rule 50. Footnotes
1. Consolidated herewith are Rudolph Finance Company, Docket No. 4799-70, and Rudolph Chevrolet, Inc., Docket No. 4800-70.↩
2. Even if the advances were contributions to capital, it would not necessarily follow that there was a constructive dividend from Rudolph Finance Company to Rudolph Investment Corporation. See W. B. Rushing, 52 T.C. 888 (1969), affd. 441 F. 2d 593 (C.A. 5, 1971); and PPG Industries, Inc., 55 TC 928↩ (1970).